## Richmond.

### EDMOND THOMPSON V. COMMONWEALTH.

#### November 17, 1921.

1. CHANGE OF VENUE—*Grounds—Testimony in Support of Change—Apprehension that a Fair Trial Cannot be Secured.*—The mere apprehension of a prisoner that he cannot secure a fair trial in a county is not sufficient to support a motion for a change of venue. He must establish by "independent and disinterested testimony such facts as make it appear probable, at least, that his fears and belief are well founded." Moreover, the testimony should establish the condition of the public mind at the time of the trial.

2. CHANGE OF VENUE—*Discretion of Court—Conditions Existing at Time of Trial.*—A motion for a change of venue on the ground of prejudice against the accused depends on conditions existing at the time of the trial, and the trial court acting on a motion for change of venue must of necessity be allowed a wide discretion.

3. CHANGE OF VENUE—*Refusal of Court to Grant—Evidence—Condition at Time of Trial—Case at Bar.*—In the instant case, a trial for homicide, it appeared that on the night of the crime public feeling was at high tension, and at different periods of that night the life of accused was really in danger on the part of some members of the excited crowds, although there was no concerted movement to take accused's life. This, however, was two months before the trial, and the witnesses who testified as to the feeling existing at the time of the trial were agreed that the general sentiment was that the law should take its course.

   *Held:* Upon the evidence it could not be said that the trial court abused its discretion in overruling a motion for a change of venue.

4. CONTINUANCES—*Discretion of Court—Review by Appellate Court.*—A motion for a continuance is addressed to the sound discretion of the court, under all the circumstances of the case; and, whilst an appellate court will supervise the action of the trial court on such motion, it will not reverse unless such action was plainly erroneous.

5. CONTINUANCES—*Refusal to Grant Motion—Case at Bar.*—In the instant case a continuance was asked for on the ground that accused was only indicted the day before, that his counsel had great difficulty in getting the names of his witnesses, that they had hoped for a change of venue, that accused had been unable to tell them much about his case, and that certain witnesses seemed reluctant to tell counsel anything. No evidence was submitted in support of this motion. It did not appear when the prisoner had employed counsel or for what length of time they had been acting for him. Nor did it appear that accused did not have a fair and impartial trial, that all witnesses favorable to him were not present, nor that his counsel did not make as good a defense as could have been made if there had been a continuance.

   *Held:* That the refusal of the continuance was not error.

6. MURDER—*Murder in the First Degree—Definition.*—Any willful, deliberate, and premeditated killing is murder in the first degree. The law infers malice from such a killing, and holds that a man must be taken to intend that which he does, or which is the immediate or necessary consequence of his act.

7. MURDER—*Murder in the First Degree—Length of Time of Intent to Kill.*—It is not necessary that the intent to kill should exist for any particular length of time prior to the actual killing to constitute a willful, deliberate, and premeditated killing. It is only necessary that such intent should come into existence at the time of the killing, or at any previous time.

8. INSTRUCTIONS—*Standardized Instructions.*—Trial courts are not infrequently at fault in failing to give precisely in their usual form approved instructions that in a measure have become standardized. The omissions that are sometimes made and the additions that are sometimes inserted in such instructions are the fruitful cause of trouble in many instances, and of reversals in others.

9. HOMICIDE—*Instructions—Standardized Instructions—Prima Facie Murder.*—In a prosecution for homicide the jury were instructed that a mortal wound given with a deadly weapon in the previous possession of the slayer without any, or upon very slight, provocation, was *"prima facie* willful, deliberate, and premeditated murder."

   *Held:* That the accused was not prejudiced by the omission of the words, "and throws on the prisoner the necessity of showing extenuating circumstances," which usually conclude this instruction. The words *prima facie* indicated that the State's case was susceptible of rebuttal by accused.

Error to a judgment of the Circuit Court of Botetourt county.

*Affirmed.*

The opinion states the case.

*Willis, Adams & Hunter,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

SAUNDERS, J., delivered the opinion of the court.

In this case the accused was convicted of murder in the first degree in the Circuit Court of Botetourt county, on an indictment charging him with the murder of one William Peck Austin, and sentenced to be electrocuted on May the sixth of the same year. To this judgment a writ of error was awarded by one of the judges of this court. From the evidence in the case, giving credence to the testimony for the Commonwealth, the material and pertinent facts are as follows:

The homicide occurred in the early part of the night of December 18, 1920, in the public road, or street, before Bolton's store, in the town of Fincastle. A gathering of white and colored boys, engaged in throwing fire crackers, were grouped in front of the store. Thompson had had no trouble with any of the boys present, and according to his own statement entertained no feeling of ill will against any of them. The defendant came to Bolton's store twice that evening. His first visit was to inquire about an axe. After leaving he returned in five, or ten minutes, again going into Bolton's store for some purpose not indicated. After staying in the store "for a right good little while," as stated by one of the witnesses, he came out and stood

54

around with the boys, who were firing pop crackers. There was some bickering, or fussing, between some of the white and colored boys, and Peck Austin, the boy who was killed, had taken a rock, or some rocks, from a colored boy named Otey. The boys were all standing in the street talking. The defendant Thompson walked across the street to a tree, and then moved to another tree of a diameter somewhat larger than a man's waist, and about thirty feet high. While he was standing under this tree, Peck Austin threw a pop cracker about two inches long into the tree. According to one of the witnesses for the State this cracker exploded in the branches of the tree about five feet above the head of Thompson. Another witness states that the cracker exploded above the top of the tree. As soon as the squib exploded, the defendant stepped behind the tree, and using a thirty-eight Smith and Wesson pistol, commenced to shoot in the direction of the boys gathered at Bolton's store. He fired four, or five times, wounding four boys, Jim Bayne, Roy Gee, Ray Young, and Peck Austin, the latter fatally. There was no shooting by any person, save the defendant, and no provocation other than the squib thrown into the tree under which he was standing. Thompson promptly fled from the place of shooting, and later was arrested at his father's house. His captors started with him for the city of Roanoke, evading one crowd which sought to intercept them. Further on they were stopped by another crowd, and forcibly compelled to return to Fincastle, the county seat of Botetourt county. They were met in the town by a crowd of angry and excited men. Some of them struck at the prisoner, or struck him. The officer started to jail with his prisoner. While on his way a shot was fired at the latter, and in the confusion the prisoner escaped. A few days later Thompson was shot and captured by a posse, and taken to Roanoke for medical treatment. He was badly wounded and his feet were frostbitten, the re-

sult of exposure in his efforts to escape. After examination in the hospital at Roanoke, the accused was taken to jail in that city, remaining there until about the middle of February, 1921, when he was returned to Fincastle for indictment and trial. Upon this trial he was convicted of murder in the first degree. There was complete unanimity among the witnesses for the State that no violence was offered to the defendant, or provocation given prior to the shooting, save the firing of a single squib in the tree over his head. Thompson states that some one said: "Let us catch him and run him out of town," but does not claim that any action was taken by the crowd to the above effect. The following questions and answers are taken from the cross-examination of the prisoner:

" *    *    *    *    *    °    *    *    *    *

Now, you tell the court and this jury that until the time that somebody said 'let us catch him and run him out of town,' no remark had been made to you by anybody up to that time?

"A. Up until when?

"Q. Until somebody said: 'Let us run him out of town?'

"A. Not any remark to me.

"Q. And absolutely nothing in the world had happened between you and this crowd of white boys up to the time of the shooting?

"A. No, sir.

"Q. And yet one of the white boys hollered: 'Let's run him out of town,' and two or three squibs popped near you, and you took out your gun, and fired immediately into this crowd of white boys?

"A. Yes, sir.

"Q. So all the justification in the world that you claim for firing these shots into this crowd of white boys was the remark that somebody made: 'Let's run him out of town,'

and the popping of two or three firecrackers. That is the only justification you tell this jury you had for firing into this crowd?

"A. That was the only thing I had reference to.

"Q. And that was the only thing that made you shoot, was it?

"A. Yes, sir.

"Q. I believe you told Mr. Willis that you shot because you were scared?

"A. Yes, sir.

"Q. Did you have to shoot five times because you were scared?

"A. Really I don't know how many times I shot.

"Q. And you tell the jury you shot to scare them, when you were thirty feet away from the boys, and they were not coming near you at all?

"A. One of the boys were coming near me.

"Q. Who was he?

"A. One of them that was in here.

"Q. Which one?

"A. I don't know them by name.

"Q. One of these boys that testified?

"A. Yes, sir.

"Q. Which was it, a good sized boy?

"A. Yes, sir.

"Q. What color of his eyes and hair?

"A. I don't know.

"Q. How far was he from you when you shot?

"A. About as far as from here to that door.

"Q. About fifteen feet?

"A. Yes, sir.

"Q. So in order to scare him, you shot four or five times into a crowd of white boys?

"A. Yes, sir."

The defendant stated that he "got behind the tree for

protection," thinking that perhaps someone of the boys would shoot at him. When asked why he kept on shooting, after he fired the first time, he replied that he was "just scared and kept on pulling the trigger." He stated further that his pistol was outside his father's house, and he got it before the shooting when he came up town. Nothing was said to defendant by the boys before he went into Bolton's store. When he came out of the store, according to his testimony, he went across the street because the boys began to throw these squibs. These squibs he states were four inches long, and three or four were thrown at him, coming in seven or eight inches of his head. This was in contradiction of all the other evidence on this point, which was that only one squib was thrown, and that one into the tree over defendant's head. This squib, according to a witness for the State, as stated *supra*, was two inches long. The witness was well aware that he was shooting towards a crowd of boys:

" *    *    *    *    *    *    *    *

"Q. So you started shooting because you were scared?

"A. Yes, sir.

"Q. And you immediately pulled your gun and pointed to Bolton's store, and commenced shooting?

"A. Yes, sir.

"Q. And you knew there was a crowd of white boys across the street at Bolton's store?

"A. Yes, sir, right there in my sight.

"Q. And there was quite a crowd of them there?

"A. Yes, sir."

The witness, in response to the question "why he didn't run down the street towards the picture show, or Thompson's house, if he was afraid of the boys at Bolton's store," replied that he "didn't think that he had any right to run down the street." He added that he "wasn't aiming to shoot anybody, that he shot towards them, but wasn't

aiming to hit none of them, that he was shooting above them."

When arrested by Mr. Godwin and Mr. Caldwell, defendant stated that "he had never done any shooting, that he was at the picture show." Later when brought back from Roanoke for indictment, he stated to Dr. Breckenridge, and repeated this statement to Mr. Caldwell that he had not done ·any shooting, "that he was at home at the time." He explained subsequently that he made these statements "because he was afraid of the mob, that he was scared, and thought the mob was coming up there and get him, that they had made an attempt before."

Defendant identified Tom Jones as the boy who had made the statement about running him out of town. The latter was put on the stand and denied making the statement, or that he had heard it made. The defendant's testimony as to the remark *supra*, was not corroborated by that of any witness either for him, or for the State. The witness Jones also denied that he was aproaching the defendant, or was in fifteen feet of him. For the State it was proved by Ernest Dillon that before the shooting he heard the accused say: · "Just let them throw one on me." This was ten or ·fifteen minutes before the shooting. The same witness heard the defendant say to Charley Hays, a colored boy, some little while ·before the pistol was fired: "Go on, and keep quiet," and stated that he (Thompson) was "then trying to smooth things over, keep things quiet." It may be added that while no one heard the remark about running Thompson out of town, Garfield Brown (colored), a witness for the State, testifies that before the shooting when most, if not all öf the colored boys were on the other side of the street from Bolton's store, some one in the direction of Bolton's store called ˆout in general terms: "You had better go on down the street." That thereupon Thompson stopped. Witness adds: "Somebody then throwed a squib over

there, and it popped pretty close, and I never seen it, but it sounded like it was close to Edmond's head, but I never seen it." The shooting immediately followed "towards the boys in front of Bolton's store."

For the purpose of a sufficient understanding of the material features of this case, the foregoing is an adequate abridgement of the testimony submitted to the jury on behalf of the State, and of the prisoner. If there is anything in the case in the way of mitigation, or defense of the prisoner's action, it is contained in the foregoing recitals, and excerpts from the record. The defendant in his petition assigns four errors:

First: The court erred in overruling petitioner's motion for a change of venue.

Second: The, court erred in overruling petitioner's motion for a continuance.

Third: The court erred in giving instructions which permitted the jury to find a verdict of murder in the first degree.

Fourth: The court specifically erred in giving the following instruction for the Commonwealth:

"The court instructs the jury that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any, or upon very slight provocation, is *prima facie* willful, deliberate and premeditated murder."

The motion for a change of venue was made on the ground that by reason of local prejudice and excitement against the prisoner it would be impossible for him to secure a fair and impartial trial in Botetourt county. This motion was brought before the court by a petition sworn to by the defendant. The petition recited defendant's arrest, the excitement and rage engendered in the town of Fincastle by his act, the first attempt to intercept the officers on their way to Roanoke, the second and successful attempt, the crowd that met prisoner and accompanying offi-

cers on their arrival at Fincastle, the shot at the prisoner, the prisoner's escape, and subsequent wounding and arrest, his removal to the city of Roanoke, and lodgment in jail in said city, the unsuccessful effort of his father to employ counsel for his son's defense in Botetourt county, though he was able and willing to pay a fee, or fees, and petitioner's inability on account of the alleged public feeling to secure affidavits in support of his petition. In connection with his petition, and to support the allegations of same, the prisoner put on the stand Shelby Caldwell, the deputy who arrested him, Turner McDowell, the clerk of the Circuit Court of the county, who assisted in the arrest, and Charles Thompson, father of the defendant. The deputy sheriff testified that after the arrest, he and others started to Roanoke with the prisoner to avoid mob violence; that they avoided one crowd armed with pistols who fired a number of shots; that they were intercepted about eight miles from Fincastle by another armed crowd who compelled them to return to Fincastle after one of the crowd had attempted to shoot the prisoner; that one of the crowd returned with them; that they were met at Fincastle on their return by a crowd of people who gathered around with guns and pistols, but that he did not hear any threats, nor was any demand made on the officers to give up the prisoner, though one or more persons struck him; that he started to jail with prisoner, and on the way some one fired a shot at the prisoner, and in the confusion he escaped, to be later recaptured. On cross-examination witness stated that the prisoner was taken to Roanoke "to find out the extent of his wounds" inflicted at the time of recapture; that he had never seen a mob, or anything resembling a mob since the night of the shooting, or heard of "anything resembling a mob." Further, the witness stated that he thought he was familiar with public sentiment about Fincastle, that in his opinion that sentiment was that the prisoner could have

a fair and impartial trial in the county; that the prisoner was brought back from Roanoke on February 16, 1921, and had been in jail until March 2, 1921; that there had been no "demonstration of anything resembling a mob" since he had been brought back; that he did not think the then public sentiment towards the prisoner was bitter, or that there was any feeling on the part of the white people towards the colored people.    On re-examination witness stated that he had not said that "there was no feeling against the prisoner," and that there had been nothing to allay sentiment against him, but "a little time;" that the prisoner was not brought back sooner from Roanoke because the doctor who was with them said that he could not stand the trip.

The father of the prisoner stated that late in the night of the shooting, after the arrest and escape of the defendant, a crowd came to his house, and threatened to set fire to the house and burn him up, "if he did not come clean;" that he did not know where the accused was, and told the crowd so; that about two weeks after the shooting he endeavored to secure counsel for his son at the Botetourt bar; that they told him that "the feelings that had been caused by this occurrence, and widespread relations with the son who got wounded—'I will be frank with you, Charles, I would rather not serve;' " that the attitude of a number of white people had not been as friendly towards him since the shooting as before; that he did not know positively what the public sentiment against the boy was; that the people did not talk to him about it; that he had had a colored man summoned to testify as to alleged statements that he had heard as to what would be done with his son, if he was not properly dealt with, and that he declined to go on the stand on the ground that he was afraid.

Turner McDowell, clerk of the county, testified to the arrest of the boy, the firing at the car, and the second

crowd at Daleville tollgate which compelled them to re-
turn to Fincastle; that he reasoned with the crowd against
mob violence, and that at their insistence, accompanied with
a display of fire arms, they returned to Fincastle; that they
put the prisoner down at the corner, seventy-five yards from
the jail, as they had promised; that twenty-five or fifty peo-
ple were there—he did not know how many; that there was a
great deal of excitement, though he did not recall that any-
one said they would lynch him; that the crowd when asked
said that "they did not know what they were going to do
with the prisoner;" that he came into touch with a lot of
people from different portions of the county in consequence
of his office; that there was a decided feeling about the
case; that he consulted about bringing the prisoner to Fin-
castle for several weeks before it was done, and it was de-
cided that it was safe; that there was a very decided opinion
about the prisoner, and possibly that carried some preju-
dice; that he knew the general sentiment, and that since
the shooting everybody was glad that nothing happened to
the man; that there had been no mob since the day of the
shooting, and no threats against the prisoner, so far as he
knew; that the general sentiment was for the law to take
its course. The following is from the examination of this
witness:

By Mr. Willis:
"Q. Mr. McDowell, in regard to prejudice, or other feel-
ing, there is a very intense interest in this county in this
trial, is there not?
"A. There is in this section.
"Q. Isn't it true that on yesterday when the grand jury
met, and today, that the courtroom is absolutely jammed
with people from all over the county?
"A. Yes, sir. This is the third case of this kind in the
last three terms of this court, and people from all over the

county have been here who were interested in these different cases."

The State introduced several witnesses to controvert the allegations of the petition for a change of venue. Mr. Woodson, an attorney at Fincastle, testified that he had been approached by the father of the defendant to represent his son, and had declined; that he had many reasons for declining; that the state of local feeling entered into his action; that he did not want to defend prisoner either for compensation, or by appointment of the court; that "his association for years with the people who were connected with the matter, their relatives and friends, and one of the boys being in his Sunday school class, made him feel that he could not take the case, and do the prisoner justice."

E. M. Stull, a citizen of Botetourt, living at Eagle Rock, thirteen miles north of Fincastle, stated that his work put him in touch with the people of Eagle Rock, and the county intervening between that place and the courthouse; that so far as he knew there was no feeling of prejudice, or resentment on the part of the public towards the prisoner.

Mr. W. G. Noftsinger, a citizen of Troutville, several miles south of Fincastle, stated that he was generally acquainted with the people "around in Fincastle;" that there was no "more prejudice, or feeling, against defendant than there would be in any other section for the same crime with which he was accused;" that there was no particular prejudice against him; that he had never heard of any threats of violence against him in the Troutville section, and that so far as he knew the sentiment in his section was that they were willing for the law to take its course; that there was a good deal of excitement when the crime was committed.

Mr. Lackland, a member of the board of supervisors, testified that he lived near Buchanan, ten miles from Fincastle, and had lived in that section all his life; that there

was no prejudice or ill will on the part of the public towards the accused, and that there was nothing to indicate that the public was not willing for the law to take its course.

Mr. C. M. Lunsford, a member of the Fincastle bar, stated that he had been approached by Thompson, Sr., in the matter of representing his son; that he had declined; that his wife was in bed at the time, and fatally ill; that she had requested him to have nothing to do with the case, and for that reason he had declined employment; that he did not fear violence, if he accepted, and that public sentiment would never prevent him from defending a man.

[1] Dr. W. N. Breckenridge, the mayor of Fincastle, testified that he participated in the rearrest of the boy, and, as the boy had been severely shot, that he took him to Roanoke for an X-ray; that the accused had been badly frostbitten, and he went to see him several times in Roanoke in respect of medical treatment; that he believed when the accused was returned to Fincastle, that his little boy could have brought him down and put him in jail; that there had been no demonstration since the night of the shooting; that before the prisoner was rearrested every man concerned agreed that the law should take its course; that two months and a half had elapsed since the shooting took place, and that he had talked practically to every man who had a son in the shooting, and they were all agreed to the above effect; that he thinks the feeling against prisoner existing at the time of the homicide had disappeared; that there was now a general feeling for the law to take its course; that there was no disposition so far as he knew on the part of anybody for any action other than for legal and orderly procedure; that the statement of defendant's father that there was feeling against his son was a mistake. On cross-examination witness stated that there was no "feeling of violence" against accused, but that he "did not think there was any love for him;" that the people were very

patient, and wanted the negro tried.    This completed the
testimony for and against the motion for a change of venue,
and the same was thereupon overruled.    This motion in the
instant case was not made on the ground of difficulty in
obtaining jurors in the county free from exception.    Hence
various cases cited in the brief for the State are not in point,
they having been held in the *Uzzle Case,* 107 Va. p. 919, 60
S. E. 52, not to apply to a motion for change of venue based
on the ground that the degree of prejudice and excitement
existing in a community against a prisoner is such that the
fairness and impartiality of a trial conducted in the county
concerned is endangered.    But the mere apprehension of a
prisoner that he cannot secure a fair trial in a county is
not sufficient to support a motion for a change of venue.
He must establish by "independent and disinterested testi-
mony such facts as make it appear probable at least, that
his fears and belief are well founded."    Moreover, the
testimony should establish the condition of the public mind
at the time of the trial.    See *Bowles' Case,* 103 Va., p.
816, 48 S. E. 527, and *Wormeley's Case,* 10 Gratt. (51 Va.)
672.

The affidavits in the *Bowles' Case* set out a more strik-
ing and impressive situation than that relied upon to sup-
port a change of venue in the instant case.    These affidavits
represented that it was impossible for the prisoner to have
a fair and impartial trial in Alleghany county; that he had
been carried to Lynchburg jail, because it was considered
unsafe to carry him through Alleghany county; that on ac-
count of this feeling it was considered unsafe to carry him
to said county, save under the protection of the military
forces of the State; that the judge of the court refused to
try him in the presence of the military; that then a public
meeting was held to give assurance to the officers that the
prisoner could be brought to Covington for trial; that this
feeling against the prisoner continued to be so bitter and

widespread that predictions were then being made, and threats uttered that if the jury should find the prisoner guilty of less than murder in the first degree, the latter would be lynched before he could be carried from the courthouse to the jail. A change of venue was refused by the trial court, and this action was sustained by this court.

The following is taken from the syllabus in *Looney's Case,* 115 Va. 921, 78 S. E. 625: "A motion under the Code for a change of venue on the ground of prejudice against the accused is addressed to the discretion of the trial court, and its ruling will not be disturbed unless it plainly appears that the discretion has been improperly exercised."

In the case *ubi supra* the motion for a change of venue was based on the ground that great prejudice and ill will existed against defendant throughout the entire county on account of the homicide and of numerous other difficulties in which accused had been involved. Moreover, that he had been informed of threats to lynch him in the event of his acquittal. The affidavits of five persons were submitted in support of the motion, and of twenty persons in opposition. The trial court overruled the motion, and this action was sustained.

[2] A motion for a change of venue on the ground of prejudice against the accused, depends on conditions existing at the time of the trial (*Looney's Case,* 115 Va. 921, 78 S. E. 625), and the trial court, acting on a motion for change of venue under section 4914, must of necessity be allowed a wide discretion, and it is the established rule that the Supreme Court will not reverse the trial court unless it plainly appears that such discretion has been improperly exercised. *Looney's Case,* 115 Va. 921, 78 S. E. 625.

The motion in question was made under Code, section 4914, which empowers the trial court for good cause shown to order a change of venue on the motion either of the Commonwealth, or of the accused.

"To support a motion for a change of venue, the accused must show such facts as will make it appear probable at least that his fears and belief are well founded." *Worme-ley's Case,* 10 Gratt. (51 Va.) 658, 672.

See also *Wright's Case,* 114 Va. 872, 77 S. E. 503, to the effect that "facts and circumstances should be established satisfying the court that a fair trial could not be had."

In *Uzzle's Case, supra,* this court overruled the trial court, and awarded a change of venue on the following state of facts: "The military forces had been sent to the scene of the crime in the first instance.    When later the sheriff was sent to Norfolk for the prisoners for trial, a posse was furnished him to protect the accused persons from mob violence, and to preserve public peace.    The excited state of feeling continued down to and through the trial of the prisoner.    After conviction of the accused, he had to be confined in the jail of another county, pending his efforts to have the judgment of the trial court reversed. Under such circumstances, this court considered that good cause for a change of venue had been shown.

[3] In the instant case it appears that on the night of the shooting the public feeling in the town of Fincastle was at high tension, and at different periods of the night the life of the accused was really in danger on the part of some members of the excited crowds.    Still there does not appear to have been any agreed, concerted movement to take defendant's life.    The crowd at Daleville that caused the automobile containing the prisoner and accompanying officers to return to Fincastle was armed and large enough to carry out at that point any generally concerted plan of lynching.    The same was true of the still larger and more excited crowd that met the automobile on its arrival in Fincastle. The members of that crowd, acting in concert, could easily have taken the prisoner by force from the

deputy sheriff, and executed him. Some such purpose may have existed on the part of individuals in the crowd, but it appears to have been an uncertain, half-formed purpose, so far as the aggregate of the mob was concerned. This appears not only from what actually took place in the course of the sheriff's progress with his prisoner from the automobile to the jail, but from a statement made by someone in the crowd that "they did not know what they were going to do with him" (*i. e.,* the accused). The exciting happenings described in the testimony, *supra,* occurred over two months before the trial, and followed hard upon the killing of one boy, and the wounding of three others. Excitement and angry feeling under such circumstances is readily understood, and it may be said to be almost invitable. The witnesses who testify as to the feeling existing at the time of the trial are agreed that the general sentiment was that "the law should take its course." The prisoner was taken from Roanoke to the Fincastle jail two weeks before his indictment and trial. The mayor of Fincastle testifies that in his opinion his little son would have been a sufficient guard to ensure the prisoner's safe delivery on that occasion. Testimony of witnesses outside of Fincastle is to the effect that no threats of violence have been made against the prisoner, and that there was no evidence of prevailing prejudice or ill will. The correct view of the situation was probably given by Mr. McDowell, when he stated that there was an intense interest in the county in the trial, and that the general sentiment was one of relief that nothing "had happened" to the accused on the night of the homicide.

In view of the precedents cited and of the evidence in the instant case, this court is not prepared to say that the trial court exercised its discretion improperly when it overruled the motion for a change of venue. The assignment of error in this respect is not sustained.

The second assignment is to the action of the trial court overruling the motion for a continuance, which was made by counsel for the prisoner, and is in the following terms: "We wish to move the court for a continuance of this case. The boy was just indicted on yesterday, and we have had great difficulty in getting the names of the witnesses he has given us to talk to, to get information from them. We had hoped the court would see fit to grant a change of venue. We will say further that the defendant has been unable to tell us much about his case. I have been told that he had a shot in the back of his neck that has affected his speech in some way. He gave us the names of certain witnesses, and they seem to be very reluctant to tell us anything at all." No evidence was submitted in support of this motion. It does not appear when the prisoner had employed counsel, or for what length of time they had been acting for him prior to the time of the trial. Nor does it appear that the "prisoner did not have a fair and impartial trial, that he did not have all persons present as witnesses who knew anything that was favorable to him, or that his counsel did not make as good a defense for him as he could have done if his case had been continued."

[4] "A motion for a continuance is addressed to the sound discretion of the court, under all the circumstances of the case; and whilst an appellate court will supervise the action of the trial court on such motion, it will not reverse it, unless such action was plainly erroneous." *Hite's Case,* 96 Va. 493, 31 S. E. 896.

The following is taken from the syllabus in *Wright's Case,* 114 Va. 872, 77 S. E. 503, as pertinent to the motion under consideration in the case in judgment: "Where the facts in a case are few and simple, and public interests demand a speedy trial, the overruling of a motion for a continuance, and proceeding to trial in forty-eight hours, was not an abuse of the trial court's discretion."

55

[5] Section 8 of the Constitution provides that a man accused of crime shall have a speedy trial by an impartial jury· of his vicinage.

Code, section 4893, was enacted to afford the speedy trial guaranteed by the Constitution. This section provides that when an indictment is found against a person for felony, the accused, if in custody, or if he appear according to his recognizance, shall, unless good cause be shown for a continuance, be arraigned and tried at the same term.

It is not considered that upon the situation presented the action of the court overruling the motion for a continuance was plainly erroneous.

[6, 7] The third assignment of error is that the court gave instructions which permitted the jury to find a verdict of murder in the first degree. The evidence of the Commonwealth justified such instructions. Any willful, deliberate, and premeditated killing is murder· in the first degree. The law infers malice from such a killing, and holds that a man must be taken to intend that which he does, or which is the immediate or necessary consequence of his act. Moreover, as frequently stated by this court, it is not neces- sary that the intent to kill should exist for any particular length of time prior to the actual killing, to constitute a willful, deliberate, and premeditated killing. It is only necessary that such intent should come into existence at the time of the killing, or at any previous time. Many· precedents to the above effect might be cited, but see *Horton's Case,* 99 Va. 853, 38 S. E. 184.

[8, 9] The fourth assignment of error is to instruction No. 2, given at the instance of the Commonwealth. This instruction is as follows:

"The court instructs the jury that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any, or upon very slight provocation, is *prima facie* willful, deliberate and premeditated murder."

The precise error assigned is that this instruction does not include the following, as a concluding sentence: "and throws on the prisoner the necessity of showing extenuating circumstances."

This instruction is almost invariably given with the foregoing as a concluding clause, and it is not perceived why this was not done in the instant case. Indeed, it may be said that the trial courts are not infrequently at fault in failing to give precisely in their usual form approved instructions that in a measure have become standardized. The omissions that are sometimes made and the additions that are sometimes inserted in such instructions are the fruitful cause of trouble in many instances, and of reversals in others. In the case in judgment, the prisoner was not prejudiced by the omission of the words, "and throws on the prisoner the necessity of showing extenuating circumstances." As given, the instruction correctly propounded the law. When the jury was told that a mortal wound given under the circumstances stated was *prima facie* willful, deliberate and premeditated murder, they were apprised that this conclusion, or derivation from the evidence for the State, being *prima facie*, was susceptible of rebuttal. Such rebuttal could come from the prisoner alone, and the burden of affording same rested upon him. The failure to insert the omitted clause does not relieve the State from the necessity of affording any evidence that would be required if it had been inserted, nor does its omission deprive the accused of the opportunity to establish extenuating circumstances.

Plaintiff in error cites the case of *State* v. *Hertzog*, 55 W. Va. 74, 46 S. E. 792, as authority for the contention that the omission to state that, under the circumstances indicated, *supra*, "the burden was cast upon the accused of proving extenuating circumstances," is error. But such was not the decision in the *Hertzog Case*. The real vice of the in-

struction in that case, and the one upon which the decision of the court rested, was the concluding words, "as they appear from the case made by the State, Grant G. Herzog is guilty of murder in the first degree." The appellate court held that the instruction told the jury that the accused was guilty of murder in the first degree, and was, therefore, erroneous. "Fairly construed," said the court, "the instruction has no other meaning." Of course, such an instruction was improper.

The instructions prayed by the accused were given as asked. They fully and fairly presented the defendant's theory of the case, stated the burden upon the State, and called attention to the reasonable doubt, to the benefit of which a defendant is entitled on all material points. Instruction 5 for the accused advised the jury of the humane principle of law that a homicide committed in a sudden heat of passion, upon reasonable provocation, and before time is given for the passions thus excited to cool, is not murder, but voluntary manslaughter.

After a careful scrutiny of the evidence, and mature consideration of the questions of law presented in the instant case, we do not find in this record any errors to the prejudice of the defendant, and the action of the trial court must be affirmed.

*Affirmed.*