# Staunton

## McKINLEY EVANS v. COMMONWEALTH.

September 21, 1933.

Present, Campbell, C. J., and Holt, Epes, Gregory and Browning, JJ.

The opinion states the case.

*A. T. Griffith* and *McCoy, Rose & Rush* and *L. E. Fuller*, for the plaintiff in error.

*John R. Saunders, Attorney-General*, and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General*, for the Commonwealth.

Holt, J., delivered the opinion of the court.

In the county of Russell and in the town of Honaker at about half past seven or eight o'clock, on the night of Saturday, December 26, 1931, McKinley Evans shot and killed Henry Yates. He was tried, convicted of first degree murder and sentenced to life imprisonment. His trial began on February 25, 1932.

McKinley came into town with his brother, Hammond Evans. They came in Hammond's car. Hammond drove and by him sat the accused. Soon after their car had come to a stop another brother, Hassell Evans, joined them, after which Yates, who was a deputy sheriff, walked up to it and summoned McKinley to appear before a justice on the following Monday. This is Hassell's account of what was then said:

"A. He said, 'McKinley, I have a warrant for you.'

"Q. What did McKinley say?

"A. Said 'That is all right, Mr. Yates, I want to go and give bond.'

"Q. What did Yates say?

"A. He said, 'No use giving another bond, you are already under bond, you can appear the same day, on the following Monday you can appear.'

"Q. What did McKinley say about appearing?

"A. He said, 'I'll be there.' "

Evidence for the Commonwealth is to the effect that McKinley said, "There will be no trial on Monday," to which Yates answered, "I have done my duty. I have done what the law requires me to do and that is all I can do." Also that McKinley was heard to say, "You won't take me nowhere, damn you. I'll kill you first."

The matter of the arrest of one Addison by McKinley was mentioned. Yates asked if Addison had cut him. McKinley replied that he had and lifted his hand to show the cut. Yates then observed that there was a report to the effect that Addison had no knife. Thereupon McKinley said that such a statement was a lie. For the defendant it is contended that Yates construed this to apply to him, was angered thereby, drew his pistol and shoved it

through the car window, which was partially down, breaking the glass. The Commonwealth contends that McKinley was angered by the service of the summons. At any rate, these two brothers then jumped out of the car, Hammond on its left side and McKinley on the right. There is much confusion as to what then occurred. Evidence for the accused is that Yates was the aggressor and fired first. A witness for the Commonwealth said that McKinley fired first. Yates' dying declaration tells us that McKinley was the aggressor. There is also evidence to show that McKinley early in December said that he would kill Yates if Yates ever undertook to arrest him, and that after the shooting he said with an oath that he wanted to "finish killing him."

It was a jury's duty to sift out the facts. It had the right to believe any credible evidence.

There are twenty-six bills of exception.

The first assignment of error and one earnestly insisted upon rests upon the refusal of the court to order a change of venue. The motion for this change is in writing. It was heard on February 5, and is supported by twenty-four affidavits.

It is said:

"That great public indignation, feeling and anger was aroused against your petitioners in Russell county, Virginia, and a mob formed in front of the home of E. M. Evans, where your petitioners were, and it was with great difficulty that the sheriff of Russell county, deputy sheriffs, a county policeman and State policemen prevented the mob from doing violence to the said McKinley Evans, and so great was the excitement that the officials permitted the said McKinley Evans to have a gun in order to protect himself from the mob."

When McKinley was arrested he was not taken to jail, but to his father's home that he might secure bail.

It is perfectly true that there was then great excitement in the town of Honaker following this affray on a principal street. It is also true that there was considerable in-

dignation and that a large number of men followed the sheriff and the accused to the Evans home; but the supporting affidavits do not show that there were any overt acts of violence. This "mob," if it may be so characterized, dispersed upon orders from the officers, who then, on a roundabout way, took the accused to jail at Lebanon, the county seat of Russell.

It is next said: "That so great was the anger, indignation and feeling of the mob that the said mob cursed and abused the aged father of your petitioners and brandished weapons in a violent and threatening manner."

The supporting affidavits mention no such incidents.

It is next said: "That petitioner, Hammond Evans, while traveling along the road at Honaker in Russell county, Virginia, in a peaceable manner was attacked by a mob and would have been killed and wounded, but for the fact that he was rescued by an officer, who took the said Hammond Evans away from the mob."

That claim rests upon this statement, made by a deputy sheriff who arrested Hammond Evans as an accessory on December 27, at Honaker:

"* * * He (I) saw a large crowd of people, a number of whom were running in the direction of the watering place or the place near where Henry Yates was said to have been shot, and upon his (my) approaching the crowd, some man came up to this affiant's car and remarked, 'For God's sake, get this man away from here before something bad happens,' or words to that effect, and this affiant made his (my) way through the crowd, and Hammond Evans, upon seeing this affiant approaching, reached out his hand, then this affiant proceeded to get the said H. W. Evans out of the crowd and proceeded to the town of Lebanon to the jail as quickly as he (I) could."

Complaint is next made of publications in two local papers, which it is said were highly inflammatory and written for the purpose of arousing public sentiment.

These are the offending articles:

"LEBANON NEWS
"Lebanon, Russell County, Virginia
"January 1, 1932.
"DEPUTY SHERIFF YATES IS KILLED IN
"GUN BATTLE
"Slayer Hurried Off to Prevent Mob Violence.

"A gun battle on the principal street of Honaker Satur-
day night about 7:30 o'clock between Town Policeman
McKinley Evans and Deputy Sheriff Henry Yates resulted
in Yates being wounded in the abdomen, dying the follow-
ing day in the Richlands hospital. Sentiment was so
strong against Evans that Sheriff Cross and deputies
rushed him to some unnamed jail to prevent mob vio-
lence.

"Deputy Sheriff Yates had a warrant charging Evans
with being drunk, and when he attempted to execute it
Evans drew his gun and fired at Yates, several shots being
exchanged. Parked automobiles were peppered with bul-
lets and people on the streets at the time took shelter.

"Ham Evans, a brother, is said to have taken part in
the battle and was wounded in the hand, it is stated by a
ball from his brother's gun. Ham Evans was not arrested
until later, and he, too, was taken to another jail.

"Yates was about fifty-five years of age, well known
and a much liked officer.

"At the time of the shooting McKinley Evans was at lib-
erty on bond pending hearing on two other indictments
in which he is alleged to have been involved during recent
weeks. About December 15, Evans and Trigg Jessee, Rus-
sell county policemen, were released under bond in the
sum of $750.00 pending hearing on January 4th in connec-
tion with the wounding of Pearl Owens, near Honaker,
Christmas Day. Evans was placed under bond to answer
charges of assaulting a man named Adams with a pistol.

"A few years ago Evans killed a man on Lewis creek,
near Honaker, and his father, Elder E. M. Evans, is said
to have paid out a small fortune to save his son. Evans

was convicted by a jury, but an appeal was granted and for some reason the case was never again tried.

"The automobile of Luther Fuller, Russell county Commonwealth's attorney, was among those struck by bullets. Fuller said, 'I ducked behind my car as soon as I saw what was happening.'

"The shooting occurred in front of the Honaker Pharmacy, and the sidewalks were peopled with Masons who were gathering for a banquet.

"The shooting climaxes a stormy career for Evans in which the use of firearms has figured several times."

"HONAKER HERALD

"HONAKER, VA., THURSDAY, JANUARY 7, 1932.

"DEPUTY SHERIFF YATES KILLED IN GUN BATTLE

"On Saturday evening, December 26, at about 7:30 o'clock, Deputy Sheriff Henry Yates was shot and mortally wounded by McKinley Evans, town policeman. Mr. Yates was serving a warrant on Evans charging him with drunkenness when he resisted arrest and drew his gun and began firing. Mr. Yates then drew his gun to protect himself, but was prevented from using it effectively by Ham Evans, a brother of McKinley. It is claimed that Ham Evans held Yates and struck him over the head. Several shots were exchanged and it was found that Mr. Yates was shot in the abdomen. He was rushed to the Richlands hospital, where he died Sunday afternoon.

"Both of the Evans were arrested and taken to the Lebanon jail, but as the people were so incensed over the uncalled for murder of one of their best officers, it was thought best to remove the prisoners to Bristol jail. Threats of mob law was heard on every hand. Quiet now prevails and our people are now willing for the law to take its course.

"At the time of the shooting McKinley Evans was at liberty on bond pending hearing on two other indictments

in which he is alleged to have been involved during recent weeks. About December 15, Evans and Trigg Jessee, Russell county policemen, were released under bond in the sum of $750, pending a hearing on January 4th in connection with the wounding of Pearl Owens, Christmas Day. Evans was placed under bond to answer to charges of assaulting Smith Addison with a pistol.

\* \* \* \* \* \* \* \* \* \*

"MUST FACE FIRST DEGREE MURDER CHARGE

"A special grand jury was impaneled yesterday and the Evans were indicted and will be tried at the February term of the court on a first degree murder charge. Bond was denied them.

### "FUNERAL OF YATES.

"Funeral services were conducted from the Baptist Church last Wednesday by Rev. R. L. Camden, and burial was made in the Clark cemetery, where the Loyal Order of Moose had charge.

"Mr. Yates needs no *ulogy* from us, the multitude attending his funeral paid him a higher tribute than is possible for us. The crowd was estimated at between 4,000 and 5,000, the largest crowd in Honaker.

"As an officer, he was one of the best, and respected as such; as a citizen, New Garden district had none better; as husband and father, he approached the ideal.

"He is survived by his widow and two children, Mrs. John Van Dyke, of Honaker, and Marion Yates, of Texas; one brother, N. Yates, of this place, and three sisters, Mrs. Crock Thomas, Mrs. Dora Jessie and Mrs. Clark.

"On behalf of the town and community we extend sympathy to the bereaved."

A man makes his own history and cannot complain if the facts are published; bishop or pirate, all must face them, for so is justly "judged the world and the people with the truth." We see nothing seriously objectionable in the account of this homicide published in the "Lebanon

News." It does state that the accused was hurried off to prevent mob violence and that he now contends was the exact truth. He did kill a man in 1921. A jury found him guilty of second degree murder. That case was reversed on appeal. *Evans* v. *Commonwealth,* 137 Va. 765, 119 S. E. 92. Indeed no statement there made is seriously denied.

The account in the "Honaker Herald" is less temperate. It characterizes the homicide as uncalled for murder, but it is said that "quiet now prevails and our people are now willing for the law to take its course." Press accounts of local homicides written *dum fervet opus* usually reflect public opinion. The accused contends that he stood upon the night of the killing in immediate danger of mob violence. In other words, he felt that the public thought he was guilty of murder, and so this publication made ten days afterwards did but restate what he now claims was generally believed.

Of course, it is possible to go beyond fair bounds and when this is done courts should intervene, but they should do so with caution, for newspapers have the right to publish news.

This case falls far short of *Jones' Case,* 111 Va. 862, 69 S. E. 953, 955, where it is said: "We trust that the people of Buckingham will demand the punishment of red-handed fire-brands and bloody criminals and refuse to let money, spent in hiring tricksters, unlock all our jail doors and turn loose all our dangerous men."

Moreover, the dates of these publications are to be remembered. The trial took place nearly two months later.

It is said that the trial judge, deeming detention in the local jail unsafe, ordered the accused to be sent to Bristol, but it is important to remember that he was brought back to Russell county on the 6th of January and remained there in jail unguarded and unmolested until his trial on February 25th. Application for bail was heard on the 6th. It is true at that time the court ordered spectators to be searched for concealed weapons. We do not know

what armament was uncovered. It was possibly a wise precaution.

A change of venue should be ordered when necessary to secure a fair trial. Code, section 4914. Since a fair trial is all that can be demanded, we look to conditions which obtain when the trial was had and not to those which existed at the time of the homicide. Deputy Sheriff Harmon said that mob violence threatened until the motion for bail was heard. Sheriff Cross said there were threats of mob violence for three days after the shooting. Other affidavits tendered by the accused are to the same effect. Feeling ran high and died away.

In *Thompson* v. *Commonwealth,* 131 Va. 847, 109 S. E. 447, it appears that at the time of the homicide feeling was inflamed and the accused was in real danger. This was two months before the trial. At the trial sentiment was that the law should be permitted to take its course. The court held that the situation at the trial itself was the touchstone. A change of venue was refused.

In *Wood* v. *Commonwealth,* 146 Va. 296, 135 S. E. 895, the accused was convicted of attempt to rape. The offense occurred on September 5, 1925, the trial was in the following November. Because of public passion the accused was, on September 9, 1925, sent to the Henrico county jail for safe-keeping. The court refused a change of venue on the ground that feeling had in the two intervening months subsided. To the same effect, see *Rudd* v. *Commonwealth,* 132 Va. 789, 111 S. E. 270; *Webb* v. *Commonwealth,* 154 Va. 866, 152 S. E. 366.

All of the Virginia cases with one voice hold that this is a matter within the sound judicial discretion of the trial judge.

We may assume that a dispassionate trial could not be had immediately following the homicide. The situation two months thereafter had changed. It is a matter of common knowledge that mob emotions die away and are forgotten.

Affidavits for the defendant are interesting from many

angles. The same language is repeatedly used. From most of them we might assume that nothing serious had happened to Yates. Some speak of his having been wounded and some of his alleged wound. Mention of death was avoided with meticulous care, though he had been buried for a month. If we take them at their face value they do not make a case. This conclusion is strengthened when we come to read countervailing affidavits on behalf of the Commonwealth. There are forty-one of them.

It is contended that they are but expressions of opinion and that expressions of opinion unsupported by adequate reasons are of little value. *Ramsay* v. *Harrison,* 119 Va. 682, 89 S. E. 977.

Here they are properly supported. They are the opinions of men who have wide acquaintanceship in the county and who have talked over this case with their neighbors. In the course of their conversations the newspaper publications were discussed, and the situation generally canvassed. They say that they had heard nothing to indicate that the accused could not be given a fair and impartial trial. All of them except one the judge knew.

This assignment of error is not well taken.

██ The first *venire facias* was quashed for a reason which did not go to its merits, and a second ordered. Thirty men were summoned that a panel of twenty qualified jurors, free from exception, might be secured. The accused moved that it also be quashed and in support of this motion assigned these reasons:

"Because the original writ of *venire facias* was issued in violation of the provision of the statute and was, therefore, null and void, and the paper styled 'Second *Venire Facias*' was obtained by the judge of the circuit court referring to a list of names typewritten on open sheets of paper and not a single name on a separate piece of paper lodged in the jury box as provided by law, and said list was not drawn from the jury box by lot as provided by the statute in such cases made and provided; and

"Because even if the original paper purporting to be the writ of *venire facias,* had not been null and void, section 4896 of the Code of Virginia requires that the court shall select the names which shall constitute the second *venire facias* to be selected by the court from the list furnished by the jury commission and lodged in the jury box which mandate was violated in that E. F. Hargis, clerk of the circuit court; Jim Gose, deputy sheriff, and A. W. Hedrick, deputy clerk, each at the instance of the judge of the circuit court, gave counsel, aid, information and assistance to the judge of the circuit court in the selection of the said names which were arbitrarily selected as aforesaid; and

"Because in the selection of the names contained upon the second *venire facias* one J. E. Purcell was selected who has been an active, ardent and interested party in and about the preparation and prosecution on behalf of the Commonwealth, and did furnish an affidavit which has been filed as a part of the record in this case."

These names were selected from the list provided for by Code, section 5988, which was the original list made up by the jury commissioners. When the selection was made there were present the clerk, a deputy clerk and a deputy sheriff. The judge asked them where some of these jurors lived. This was on the day before the trial. It is important that these jurors should be living where they could with fair effort be found. He might have asked if they were then living. It would have been troublesome and useless to put men on the list who could not be reached. We see no objection to this procedure. It is common practice, for often the judge is a comparative stranger to some of the counties of his circuit.

J. E. Purcell had signed an affidavit to the effect that there was no bias or prejudice in Russell county such as would prevent the accused from being given an impartial trial there, and that public sentiment had not been inflamed by published accounts of the homicide. We think that Purcell was not a competent juryman, but the

law does not require that every man whose name appears on the *venire facias* shall be competent. If this were true, then it would be necessary to examine prospective jurors before the *venire facias* actually issued. This is never done. So many persons as are deemed necessary are summoned to obtain a panel of twenty, free from exception. All that the statute requires is that men on the panel be free from exception. That requirement does not extend to the *venire facias* itself.

When a jury is to be impaneled men on the venire are called and examined always by the court and often by counsel. In addition to peremptory challenges, jurors may be rejected for cause. The disabilities under which Purcell labored were known to counsel and to the court. They were a matter of record and yet no exception was taken to his selection. One of two things must be true—either because of his high character they were willing to accept him notwithstanding the statement which he had made, or they were willing to have him go upon the jury that they might take their chances on a verdict. If it was "Not guilty," well and good; if it was "Guilty," then the incompetence of a juror might be urged on a motion to set it aside. This objection comes too late. Two other jurymen were circumstanced as was Purcell, although they were not named in the motion to quash the venire. All that has been said about Purcell applies to them.

It is said that evidence of certain threats was improperly admitted.

This is the statement of Brownlow White, a witness for the Commonwealth: "He (the accused) said it looked like Tom Aston and Henry Yates were going to put him in jail from now on, said Henry Yates had been carrying a warrant for some one there for near a year and hadn't served it, and he said 'when I break the law I will go to jail myself, but no damn cutthroat like Henry Yates can take me to jail.'"

Bob White, another witness, testified to this statement from McKinley: "If Henry Yates ever got any warrants

for him or tried to arrest him, he would put him out of business, damn him."

It must appear that conditions have been fulfilled before conditional threats are competent evidence. That is substantially the situation here. Yates did have a warrant for arrest, but did not actually make it because the accused was already under bail to appear at the place and time which the Yates warrant called for. McKinley said there would be no trial on Monday and there was none.

"On the trial of an indictment for murder, former grudges and antecedent menaces are admitted to be given in evidence as proof of the prisoner's malice against the deceased." 3 Russell on Crimes (9th Ed.) 288, cited with approval in *O'Boyle's Case,* 100 Va. 785, 40 S. E. 121.

Several exceptions deal with the admission of dying declarations. Conditions which made them competent were amply shown. This statement was made in the presence of H. S. Johnson, a law student; his father, G. B. Johnson, and Norman Yates. It was written by G. B. Johnson.

### "DYING STATEMENT OF HENRY YATES.

"I have to die. Can't live. Had warrant for Evans & I went over there. I walked up to the car & said Howdy to McKinley & Ham & I said I have a warrant for you, McKinley, & I want to notice you before Squire Aston for the 28th 1931, for 2 P. M. & he shot at me & hit Ham I reckon, Ham had Hold of me Ham said Don't you Draw a gun here or I will shoot your brains out & hit me over the head with his *first* & I jerked him around Ham & McKinley both in the car & McKinley started to shoot me from his side of the car, & he jumped out & shot me & Ham had hold of when I was shot & Hassell had hold of McKinley—& when Hassel would get hold of McKinley he would jerk Loose & shoot, he McKinley shot 3 shoots at me, I jerked my Gun out my pocket, when Ham Evans caught me, *Evans McKinley* said I had treated him wrong

& I said I had not. I was not doing anything in the world to McKinley when he shot me, I was noticing him for trial, was not arresting him. I shot 5 times at McKinley Evans because he was trying to kill me & he McKinley said he would shoot my God Damn brains out. Ham Evans would knock my Gun down when I would try to shoot, every time he knocked my Gun down it would fire.

"Signed on Margin: 'H. S. Johnson,' 'N. S. Yates.'

"Witnessed:
 "H. S. Johnson
 "N. Yates."

This declaration, though not signed by Henry Yates, was read to him and approved by him.

 A man who believes that he is in immediate presence of death may make one or more dying statements. If made at different times all of them may be admitted in evidence, even though they contradict each other. Contradictions are for the jury. But when a statement is reduced to writing and signed by the declarant or is read over to him and assented to by him it is the best evidence as to what was then said. Oral testimony to vary it is incompetent. Wharton's Criminal Evidence, section 295; Underhill's Criminal Evidence; section 256; 1 Greenleaf on Evidence (16th Ed.), section 161; 30 C. J., p. 258. Professor Wigmore is not in accord with this view (3 Wigmore on Evidence, section 1450), although he concedes that the weight of authority is against him, and this court in *O'Boyle's Case, supra,* appears to have approved of the majority rule. That point, however, was not expressly decided. But if the oral evidence is in substantial accord with the written statement, such error, if error at all, is harmless.

This statement by H. S. Johnson is relied upon as constituting a substantial variance: "That McKinley took offense at the statement he made to him to the effect that he had the warrant and that McKinley said something to the effect that 'You have imposed upon me long enough' or words similar to that." The written statement contains

these words: *"Evans McKinley* said I had treated him wrong." They both tend to show some antecedent animosity and are in substance the same. Nowhere does the evidence of Johnson differ materially from the written declaration.

The testimony of Edna Van Dyke and of Elizabeth Whitt set out declarations made at other times and so is competent.

The manner in which the written declaration was dealt with is somewhat confusing. It seems that counsel for the Commonwealth were first of opinion that it was inadmissible and undertook to use it only as a memorandum, whereupon counsel for the accused asked that it be produced, although they, too, appeared to believe that it was not competent evidence. As a matter of fact, it was afterwards introduced without objection on their part and so no harm was done.

 This instruction was given on behalf of the Commonwealth:

Instruction B: "The court instructs the jury, that a mortal wound given with a deadly weapon, in the previous possession of the slayer, without any, or upon very slight, provocation, is, *prima facie,* wilful, deliberate and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances."

McKinley Evans was town sergeant and had a right to be armed, and so there are no presumptions against him because of that fact. Wharton on Homicide, p. 127. The instruction cannot be construed to mean that malice may be inferred from the possession of a deadly weapon. It may be inferred from the manner of its use.

 " 'The test of criminal intent in the use of a deadly weapon is to be found not in the manner in which, or the purpose for which, the previous possession of the weapon was acquired, but in its deliberate use for a deadly purpose.' *Mealy* v. *Commonwealth,* 135 Va. 585, 115 S. E. 528; *McMurray* v. *Commonwealth,* 143 Va. 490, 129 S. E. 252." *Pauley* v. *Commonwealth,* 151 Va. 510, 144 S. E. 361, 363.

An officer has no more right to kill a man without provocation or upon very slight provocation than has any other citizen.

Instruction D told the jury that it is the duty of every good and true citizen to yield prompt and willing obedience to the law, and further that if they believed beyond a reasonable doubt that the accused became enraged because the deceased undertook to serve a warrant upon him and attacked and killed Yates for no other reason, he is guilty of murder in the first degree. It is the duty of good citizens to yield obedience to the law, and this statement, though somewhat argumentative, is plainly not prejudicial error. A jury might have believed from the evidence that the shooting was occasioned by the service of the warrant. Yates said in his declaration, "I was not doing anything in the world to McKinley when he shot me," and McKinley had just said "There will be no trial on Monday."

In Instruction F, the court said: "* * * that dying declarations, when deliberately made under the solemn sense of impending dissolution, and concerning circumstances in respect of which the deceased was not likely to have been mistaken, are entitled to as great weight, if precisely identified, as if the deceased had been living and sworn in court and had testified the same as said dying declaration."

The weight of this evidence was for the jury and in weighing it the circumstances in which the statements were made should have been considered. Since its weight was for the jury, the court should not have given them any specific instruction on that phase of that subject. They are taken as if made under oath and that is all. *Swisher* v. *Commonwealth,* 26 Gratt. (67 Va.) 964, 21 Am. Dec. 330; *O'Boyle's Case, supra; Pendleton* v. *Commonwealth,* 131 Va. 676, 109 S. E. 201.

"When admitted the weight or credit to which such declarations are entitled is a question for the jury." *Pippen* v. *Commonwealth,* 117 Va. 919, 86 S. E. 152, 154.

"After a dying declaration, or any other evidence, has been admitted, the *weight* to be given to it is a matter exclusively for the jury. They may believe it or may not believe it; but, so far as they do or do not, their judgment is not controlled by rules of law." (Author's italics.) 3 Wigmore on Ev., section 1451; 1 Wharton's Crim Ev., section 303.

The approach of death is the most impressive experience that men are called upon to face. Statements then made are weighty, and the possibilities of deliberate falsehood are remote, but vital incidents may have been forgotten and they lack the winnowing test of cross-examination.

This evidence was extremely important and it was reversible error for the trial court to undertake to say to the jury how it should be considered or weighed by them, or indeed to call particular attention to it at all. *New York, P. & N. Railroad Co.* v. *Thomas,* 92 Va. 609, 24 S. E. 264.

There are other objections to instructions given for the Commonwealth, but they are not serious and we will content ourselves by saying that in them are no reversible errors.

This may also be said of instructions tendered on behalf of the accused and rejected by the court with possibly two exceptions. Sometimes they deal with matters elsewhere adequately covered, at other times with those which could not affect the merits of the case.

Rejected instruction No. 7 undertook to tell the jury how they should consider the testimony of the accused. It reads:

"The court instructs the jury, that in the case at bar the defendant, McKinley Evans, is a competent witness in his own behalf, and that you should weigh and consider his evidence in accordance with the same principles that should actuate you in weighing and considering the evidence of the other witnesses in the case, and the jury are instructed that you can not arbitrarily disregard or reject his testimony because he is charged with an offense."

The weight to be given to this evidence was for the jury and was a proper matter for argument, but the court was right in refusing to instruct them upon it as a matter of law. Instructions should not discredit it or stamp it with approval.

"The credibility of accused, like that of every other witness, is for the jury to determine; and if they believe his testimony to be true, they should act upon it, or, if they disbelieve it, they should disregard it; and, as a general rule, it is improper for the court, in its instructions, to invade the province of the jury in this regard. The court should not, where the statute makes accused competent, give instructions discrediting his testimony or assuming that discrediting facts have been proved." 16 C. J., section 2343. See, also, *State* v. *Vest,* 98 W. Va. 138, 126 S. E. 587.

 Instruction No. 11 was rejected. It deals with this incident:

Trigg Jessee, shortly after the shooting, said to McKinley, "You fired the first shot," and he said, "Keep your damn mouth shut." It told the jury that this statement, if made, could only be considered as affecting credibility. He was in a position to know the facts and this charge made to McKinley brought from him no reply. It was properly submitted to the jury for what it was worth.

 No reasons were assigned for exceptions taken when these instructions were rejected. This should have been done under Rule 22 of this court. We do not mean to say that it is in every instance necessary. If the court were asked to tell the jury that the defendant was presumed to be innocent and that this presumption went with him throughout the trial, and if that instruction were rejected and an exception taken, it would not be necessary to assign any reason. The necessary reason would be immediately apparent, but where matters involved are dealt with, reasons should be assigned in fairness to the trial court. *Trent* v. *Commonwealth,* 155 Va. 1128, 156 S. E. 567. Generally, reasons in short form should be assigned.

It is not necessary for us to deal with after-discovered evidence, and for manifest reasons we shall not undertake to discuss the weight of that now before us.

A number of other exceptions were taken. They deal either with matters not likely to arise at another trial or with those not vital to this case and not of general interest.

Because of error in the instruction which deals with dying declarations, the judgment of the trial court should be reversed, and it is so ordered.

*Reversed and remanded.*

CAMPBELL, C. J., and EPES, J., concurring:

We concur in the opinion of the court except as to its conclusions with reference to that instruction which told the jury that "a mortal wound given with a deadly weapon, in the previous possession of the slayer, without any, or upon very slight, provocation, is, *prima facie,* wilful, deliberate and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances."

We think this instruction is susceptible of being construed to mean that malice could be inferred by the jury from the possession by Evans, who was an officer, of a deadly weapon, and that the court committed prejudicial error in giving it.