## Staunton.

## EVANS v. COMMONWEALTH.

September 20, 1923.

1. HOMICIDE—*New Trial—Commonwealth's Evidence not Inconsistent with Defendant's Theory of Self-Defense—Case at Bar.*—In the instant case, giving full credit to the testimony of the witnesses for the Commonwealth, it is found that such testimony is not in conflict with the theory which the testimony of the court witnesses and that of the accused tended to support, namely, that deceased pointed his drawn pistol at the accused, and, as it reasonably appeared to them, was at least about to shoot, if he did not in fact fire the first shot, at the time accused fired their pistols, and that the latter shot in self-defense, in reasonable apprehension of, and in order to prevent, death or serious bodily harm. According to this theory the accused were not guilty of any crime, and as such theory was based on the evidence, and was consistent with all of the evidence in the case, it is manifest that the testimony before the jury was insufficient to establish the guilt of the accused. Hence a verdict of guilty of murder in the second degree was unsupported by the evidence.

2. HOMICIDE—*Witnesses—Production of Eyewitnesses by Commonwealth—Eyewitnesses Called by the Court—Demurrer to the Evidence.*—In the instant case all of the witnesses called by the court were eyewitnesses of the shooting, but the Commonwealth was not compelled to introduce them. When called by the court, they were not the witnesses of either party, and on a demurrer to the evidence their testimony cannot be considered, for the purpose of contradicting the evidence for the Commonwealth, which has been admitted as true. Nor, if adverse, would it be considered as admitted as true.

Error to a judgment of the Circuit Court of Russell county.

*Reversed.*

The opinion states the case.

*Finney & Wilson* and *A. T. Griffith,* for the plaintiffs in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr.,*
*Assistant Attorney-General,* and *Leon M. Bazile, Second*
*Assistant Attorney-General,* for the Commonwealth.

BURKS, J., delivered the opinion of the court.

Bun Evans and McKinley Evans, the plaintiffs in
error, were convicted of murder of the second degree,
and sentenced to confinement in the penitentiary for a
term of five years.

Bun Evans had incurred the hostility of Albert Sykes
by assisting in his arrest for drunken and disorderly con-
duct, and Sykes had frequently declared his purpose to
kill him. He declared this purpose to one witness three
weeks before he was killed, and to another witness on
the day of his death, both of which were promptly and
before the homicide communicated to Bun Evans. On
the day of the homicide and immediately preceding it,
Sykes declared to two witnesses for the Commonwealth
that "he was going up there and if he said a word to
him he would kill him." On April 5, 1921, about 6:30
p. m., Sykes, who was under the influence of liquor, was
walking up the railroad in the direction of the house of
McKinley Evans, in company with several boys and a
man, and was talking to them "about Bun Evans tak-
ing a gun off of him, and said he could not do it again."
He "pulled out his gun and showed it" to the man, who
tried to get him to go back with him, but he would not,
and who also tried to get him to give up his pistol, say-
ing it would get him in trouble, but he refused to do so.
He continued to walk along the railroad until just op-
posite the house of McKinley Evans, when the shoot-
ing took place resulting in his death.

The Evans house is just a few feet from the railroad
and below the grade of the track. Bun Evans boarded

with his brother, McKinley, who had never seen Sykes before and knew nothing of his ill will towards Bun. When Sykes approached, Bun Evans and McKinley Evans and his wife were sitting on the porch of McKinley Evans, about fifteen feet from the railroad. There were a number of eyewitnesses to the shooting, but they differ somewhat in the exact details of what took place when Sykes reached a point just opposite the house of McKinley Evans. The chief witness for the Commonwealth testified on this subject as follows:

"Sykes walked along in front of the store and on up the railroad track until he got about even with McKinley Evans' house, one of the boys said to him: 'Where did you get your liquor?' and he said: 'Go to hell, you imposed on me once up here at Drill, and I do not want any trouble with you.' I looked up and both of the Evans boys had their pistols on Sykes, and Sykes had his pistol out in his hand pointed kindly down. Bun Evans said to Sykes: 'Don't raise your pistol or I will shoot you,' and said to him several times: 'Don't put that pistol on me.' They talked about a half a minute, and I walked down off the porch steps, crossed the railroad track and went up the little path in front of them and was standing on the tram road when the shooting occurred, about a distance of seventy-five or one hundred yards from where they were. After they had talked for about a half a minute Sykes started up the railroad track waving his pistol in his hand; after he had walked a short distance he turned and Mrs. McKinley Evans said to not shoot there, and McKinley Evans stepped off the porch to some little bars that were between the houses and shot to right of Sykes; Bun Evans then shot; Sykes then shot kindly down. Sykes seemed to limp when the second shot was fired. He walked about six or seven steps before he fell.

Sykes said: 'Oh Lordy,' or something like that just before he fell."

Another witness for the Commonwealth, a boy fourteen years of age, testified as follows: "We went on up the railroad and caught up with Albert Sykes; he was talking to us about Bun Evans taking a gun off of him, and he said he could not do it again. We met up with Sam Rowe and he pulled out his gun and showed it to Sam Rowe, and Sam tried to get him to go back with him, but he would not, and he tried to get him to give him his pistol; told him that it would get him into trouble; he said it would not and would not give it up. We went on with him, and when he got even with McKinley Evans' house, McKinley said, 'give me a drink of liquor,' and Sykes said, 'you go to hell,' and put his hand in his right coat pocket on his pistol, and pulled it around this way (shows pulling coat around to front with hand in right coat pocket). You could see the handle of the pistol sticking out. McKinley Evans and Bun Evans pulled their pistols and put them on him just like you would if you were going to shoot a chicken. I was facing the Evans boys when they pulled their pistols. I started back pretty fast and went back to the store porch where Bill Graham was. When I looked back they all had their pistols out. Bun Evans told Sykes to not put his gun on him; Sykes pulled out his gun and swung it around in the air like this and as he come down on them with it, this way (showing), the Evans boys began to shoot. Sykes shot twice just before he fell. Bun Evans and McKinley Evans pulled their pistols out of their pockets before Sykes pulled his pistol out of his pocket."

Two other witnesses for the Commonwealth, aged respectively fourteen and sixteen, were with the last-mentioned witness and concur in his statement of the

efforts of Rowe to get the pistol from Sykes and to get him to go back with him, but for reasons stated by them "did not see who pulled their guns first, nor who shot first." Each of these witnesses also state that Sykes said that Bun Evans "had helped to take a pistol off of him and he was going up there and if he said a word to him, he would shoot him."

There were three other eyewitnesses of the shooting, who were put on the stand as the court's witnesses, "subject to cross-examination by both sides." One of these witnesses stated that when she came in sight of the parties all three of the parties "had pistols drawn on each other," and that she saw "Albert Sykes shoot twice at Bun and Mac Evans, and then they shot at Sykes, they had their guns on each other all the time. * * The Sykes boy shot first." Another of these witnesses testified as follows:

"When he (Sykes) got in front of McKinley's house where Bun Evans was boarding they spoke to each other, and then McKinley asked Sykes to give him a drink of whiskey, Sykes told McKinley to go to hell; then Sykes pulled a revolver up in his hand, and Bun and McKinley raised their pistols and told him not to point his pistol that way. Sykes raised his gun into the air and let it drop over in the direction of Bun, and Bun told him not to point the pistol in that direction. Sykes then said, 'you are the damned son-of-a-bitch that helped to arrest me.' Bun told him to go on. Then Mrs. Evans began to scream and told them not to shoot there. McKinley said something about hitting his wife, and he stepped off the porch. Then Sykes fired at him. McKinley shot back, and then Bun shot. After Bun shot the boy fired again, that was the time that he almost hit me on the porch."

The third witness testified that she "saw Albert

Sykes shoot twice at Bun and McKinley Evans, and then they both fired on him.''

Mack Evans, a brother of the accused, testified that Sykes fired two shots at Bun and McKinley, and that when Sykes fired, then Bun and McKinley both fired. Bun Evans, after testifying as to the information he had received of the threats made by Sykes, testified that ''Sykes came up the railroad about fifteen or twenty feet from where I was sitting, and McKinley said: 'Buddy, give me some liquor,' and Sykes said to me, 'you are the damn son-of-a-bitch that helped arrest me' and he threw his gun on me. I jumped up and threw my pistol against the porch post on him. Sykes walked up the railroad sideways a few steps, and held his pistol on me and fired, and then fired again, and I shot two shots at him. I shot him because he was shooting at me, and I saw that he would kill me or my brother if I didn't shoot him. Sykes was thirty to thirty-five feet from me when the shooting was done.''

. McKinley Evans testified as follows: ''Sykes came up the railroad in front of my house, and I said: 'Buddy, give me a drink of liquor.' I saw his gun and I thought if I asked him for a drink in a friendly way it might attract his attention and keep him from coming into the house, for he was sidling up to the house with his hand on his gun. When I spoke to him he said: 'Go to hell, damn you.' Then he said to Bun: 'You are the damned son-of-a-bitch that helped take my gun off of me;' and threw his gun on Bun. He walked up the railroad sideways a few steps, having his right side to us and holding his gun on us, and then fired twice, and I fired as quick as I could after he shot. I couldn't tell which one he was shooting at. I knew it was shoot, or he would kill one or both of us. The shooting was quick.''

The physician who made the post mortem exami-

nation testified as follows: "I am a practicing physician; live at Drill, Virginia; have been here for the last sixteen months. I was called on to see Albert Sykes about forty-five minutes after he was shot. He was at his father's home. I found two wounds on his body; there was one wound in the leg, ball had entered in the left leg here (pointing to inside back of left leg on calf of leg, and then .pointing to outside of left leg, about two inches higher than where it went in). The wound in the body was on the right side below the nipple straight in, and it was made with a larger ball than the one that was in the leg. I gave the ball taken out of the body to J. T. Sizemore. It was a thirty-eight calibre ball. The ball in the left leg went in the back of the leg and came out in the front part of the leg. This wound looked as if it had been made with a thirty-two calibre ball. (Ball handed to witness.) This appears to be the ball."

At the preliminary hearing before a justice of the peace, on the day after the homicide, both of the accused were discharged. The indictment was found a month later.

[1] There are several assignments of error, but it is unnecessary to notice any of them except the assignment that the verdict is contrary to the law and the evidence.

When we have given full credit to the testimony of the witnesses for the Commonwealth, we find that it is not in conflict with the theory which the testimony of the court witnesses and that of the accused tends to support, namely, that Sykes pointed his drawn pistol at the accused, and, as it reasonably appeared to them, was at least about to shoot, if he did not in fact fire the first shot, at the time the accused fired their pistols, and that the latter shot in self-

defense, in reasonable apprehension of and in order to prevent death or serious bodily harm. According to this theory the accused were not guilty of any crime, and as such theory was based on the evidence and was consistent with all of the evidence in the case, it is manifest that the testimony before the jury was insufficient to establish the guilt of the accused. Hence, we cannot escape the conclusion that the verdict is unsupported by the evidence.

[2] One of the witnesses for the Commonwealth testified that "Bun Evans told Sykes to not put his gun on him; Sykes pulled out his gun and swung it around in the air like this, and *as he came down on them with it, this way* (showing), *the Evans boys began to shoot.*" (Italics supplied.) This is fully sustained by the "court witnesses" as well as by the defendants, and is not in conflict with other witnesses for the Commonwealth. All of the witnesses called by the court were eyewitnesses of the shooting, but the Commonwealth was not compellable to introduce them. *Hill's Case*, 88 Va. 633, 14 S. E. 330, 29 Am. St. Rep. 744. When called by the court they were not the witnesses of either party, and on a demurrer to the evidence their testimony cannot be considered for the purpose of contradicting the evidence for the Commonwealth which has been admitted as true. *Clark's Case*, 90 Va. 360, 18 S. E. 440. Nor, if adverse, would it be considered as admitted as true. In the case at bar it was highly favorable to the accused. Upon the evidence as a whole, the verdict of the jury is plainly contrary to the evidence. The deceased was "breathing out threatenings" against one of the accused almost at the time the conflict began, while the accused were quietly sitting on their own porch offering neither threats nor violence to anyone. They simply repelled an assault

made upon them by the deceased with a deadly weapon.

The judgment of the trial court will, therefore, be reversed, the verdict of the jury set aside, and the case remanded to the circuit court for a new trial, if the Commonwealth shall be so advised.

*Reversed.*