## Richmond

JOE HENRY HAMPTON v. COMMONWEALTH OF VIRGINIA.
FRANK HAIRSTON, JR. v. COMMONWEALTH OF VIRGINIA.
BOOKER T. MILLNER v. COMMONWEALTH OF VIRGINIA.
HOWARD HAIRSTON v. COMMONWEALTH OF VIRGINIA.
FRANCIS DESALES GRAYSON v. COMMONWEALTH
OF VIRGINIA.
JOHN CLABON TAYLOR AND JAMES LUTHER · HAIRSTON v.
COMMONWEALTH OF VIRGINIA.

March 13, 1950.

Records Nos. 3635-3640.

Present, All the Justices.

534

The opinion states the case.

*Martin A. Martin, S. W. Tucker, Roland D. Ealey* and *J. L. Williams,* for the plaintiffs in error.

*J. Lindsay Almond, Jr., Attorney General,* and *Henry T. Wickham, Assistant Attorney General,* for the Commonwealth.

HUDGINS, C. J., delivered the opinion of the court.

Joe Henry Hampton, Frank Hairston, Jr., Howard Hairston, Francis DeSales Grayson, John Clabon Taylor, James Luther Hairston and Booker T. Millner, were charged in one

indictment with raping Mrs. Ruby Stroud Floyd, a married woman 32 years of age, on January 8, 1949. It was also charged in separate counts that each defendant was present aiding and abetting the other six as one after the other raped her. Five defendants were tried separately, and two, John Clabon Taylor and James Luther Hairston, jointly. The six juries found the defendants guilty and fixed the punishment of each at death.

The seven defendants were arrested within thirty hours after the crimes were alleged to have been committed. On January 21, 1949, the trial court appointed seven able and competent lawyers, one to defend each defendant. On February 17, defendants were given a preliminary hearing by the police justice and held for further action by the grand jury. On April 19, the trial court heard and overruled defendants' motion for a change of venue, and on April 21, Joe Henry Hampton was tried. The other six defendants were tried soon thereafter.

The cases were argued together. All of the details do not appear in each of the six records, but the material facts, with some of the gruesome testimony quoted, are:

At approximately five p. m., on January 8, 1949, Mrs. Floyd started to the home of Mrs. Ruth Pettie, a negro woman, to collect a debt. She stopped at Rosa Martin's for the purpose of asking her to show her the way. Mrs. Martin was not at home, but Charlie Martin, her eleven-year old son, agreed to go with Mrs. Floyd to find the Pettie home. The two, as they went down the track of the Danville and Western Railroad, passed four negro men—Joe Henry Hampton, Howard Hairston, Booker T. Millner, and Frank Hairston, Jr. On their return, and as they were walking along the railroad track, the same four men were so grouped on the right of way that Mrs. Floyd and Charlie Martin, in order to get by them, were compelled to step off the track into the weeds and briars on the side. As they passed, one of the negro men said "Hey Honey," or "Wait Honey," or words to that effect, which so frightened

Mrs. Floyd and Charlie that they began to run. The men overtook them. Joe Henry Hampton grabbed Mrs. Floyd from behind "then he brought me to a complete standstill and pushed me to the side of the track and I fell, my whole weight, and him on top of me, on my back." He said, "Don't you scream;" "Don't you holler." "Do not say a word, and put his hand over my mouth to keep me from hollering. By that time these others coming on behind had got up to where we were and they began pulling my clothes off. * * * They told me if I hollered they'd kill me. They had their hands on me, holding me down."

Mrs. Floyd further testified that they tore her stockings from her supporters and "started pulling my bottom pieces off. * * * And I begged them to turn me loose *. * * Everytime I tried to say anything they hit me in the face and in the mouth and said 'Lay down and hush.' The others were prizing my legs open, holding my legs open and they were feeling of me."

 \* \* \* \* \* \* \*

"Q. Can you tell these gentlemen what happened next?"
"A. Well, after he (Hampton) had intercourse with me then he helped to hold me and the others had intercourse with me, the other three. They were holding my legs, prizing my legs open. Every time I pulled my legs together they said 'Hold them legs up woman.' Every time I tried to holler or say anything they'd slap me in the mouth, and as each one got on me he put his tongue in my mouth, what time their hands weren't in my mouth. They kept my mouth covered all the time with their hands and tongues, sucking my tongue and slobbering all over me."

Charlie Martin, the eleven-year old boy who was with Mrs. Floyd, testified that on the way from the Pettie home, and as they passed the four men, Joe Henry Hampton grabbed Mrs. Floyd. Both he and Mrs. Floyd holloed and she began crying. He saw Joe Henry Hampton throw her down and "get on top of her," and "when he got up" "Frank Hairston, Jr. got on her." Booker T. Millner grabbed

him and gave him a knife and told him "Anybody (who) come down there to cut them." The boy did not accept the knife. Millner then gave him a quarter and told him if he told anybody of the occurrence he (Millner) would kill him. Charlie left the scene, but did not tell any one what had happened until several hours later.

The four men started quarrelling or fighting among themselves, close to, or over Mrs. Floyd while she was down on the ground. While they were thus engaged, Mrs. Floyd crawled away. As she did so, she saw three other negroes, John Travis Redd, Josephine Grayson and Leola Millner, the latter a young girl, passing. Mrs. Floyd staggered to them, and frantically caught Josephine Grayson around the waist, crying and begging for help. No assistance was offered. The three went on their way.

Josephine Grayson testified "one of the boys grabbed her (Mrs. Floyd) away from me and carried her down the railroad."

Mrs. Floyd stated that about this time "I heard them say they were going to carry me to the swamp, it was too public on the railroad track. Two got me by the shoulders, the others tried to get my feet and tried to carry me. I was screaming and trying to holler. They kept their hands over my mouth. I managed to free my feet where I could kick them. * * * They drug me to the woods. When they got me out there they just slammed me up on a little embankment under some trees, seemed to be in a path like, and they kept telling me 'Don't you holler, don't you scream.' I was trying to plead with them to turn me loose * * * They kept their hands over my mouth and kept their tongues in my mouth and there were more after they got me in the woods than there were on the tracks. Just how many I do not know."

Ethel Mae Redd who lived not far from the scene of the crimes, testified that a little after six p. m. Francis DeSales Grayson came to her home and told John Clabon Taylor and James Luther Hairston, who were there, that "Some

boys got a white lady up on the tracks. * * * Come on, let's go up there." The three left her home going in the direction of the railroad tracks.

Francis DeSales Grayson, in his statement to the officers, said: (as). "I was walking home * * * I saw a man on a woman and heard her begging him to let her go, that she had children at home and she belonged to the church. I went on home and John Taylor and James Hairston were there. I told them what I had seen and we three went back up there. When we got there Frank Hairston, Jr.; Howard Hairston, Booker T. Millner, Joe Henry Hampton were all around a white woman. It looked like all of them went to her before I left. John Clabon Taylor was the last one to go to the woman. When he finished I tried to go to her, but I could not * * *. I tried for two or three minutes but was unable to do the job."

James Luther Hairston, testifying in his own behalf, said that when he, John Clabon Taylor and Francis DeSales Grayson arrived at the scene they found "a white lady" and the four other defendants around her. When asked what he did then, he said:

"A. Well, all of the boys—I seen the boys go to the lady * * * Howard was the last one of the four that was up there and he left and DeSales Grayson got on her and he got off of her and I went to her. I got off and John Taylor went to her * * * Me and John left DeSales Grayson up there."

Mrs. Mary Wade, a negro woman, testified that about 7:30 p. m. on January 8, Mrs. Floyd came to her house. "She was crying * * * and asked me to call an ambulance. She said thirteen boys had raped her. She had a blue sweater on and on the arm it was torn. There was scratches on her arms. Her clothes was kind of hanging off and her hair tangled up. * * * Her thighs were red-rubbed like. Her princess slip was on and shirt and sweater. She did not have on any bottom clothes."

Mrs. Wade called her husband, who armed himself with

a pistol, and the two, one on each side of Mrs. Floyd, went with her to Prilliman's Paint Shop, and telephoned the police.

After Mrs. Floyd had informed the officers of what had occurred, they went to the scene of the crimes and found Mrs. Floyd's change purse and watch. "The ground was all scarred up, weeds mashed down." They were unable that night to locate the spot where Mrs. Floyd said the men had taken her after ravishing her on the track, but the next morning they were able to locate the place where a scuffle had taken place, weeds had been mashed down, and a man's hat was lying near by.

Mrs. Floyd was admitted to the Martinsville hospital at 9:30 p. m. on January 8th. The doctor who examined her at the time, said "She was very disheveled, her hair had apparently not been combed. Examination of her clothes did not reveal any bloodstains on them. However, there was an amount of dirt on her dress, slip and her coat. * * * there was some swelling on her lower lip. * * * multiple scratches and abrasions on both elbows, both shoulders, both knees and along the left thigh there was a long scratch, which to me was made by a finger-nail run from the outer surface down towards the knee. * * * a few scratches on the back of the neck, the right chest and the buttocks."

Mrs. Floyd, against the advice of her physician, returned home that night, but went back to the hospital early next morning where she stayed until January 15, 1949. While there she was not allowed to have visitors because of her emotional disturbance. She left the hospital on the 15th but returned on the 25th and stayed until January 31st.

Dr. Baynard Carter testified that on February 4th he saw Mrs. Floyd in Duke Hospital, in Durham, North Carolina. Among other things, he found an inflammatory mass on the left side of her pelvis, which, in his opinion, originated from an injury caused by penetration of either the vagina or rectum.

Mrs. Floyd was given the usual treatment, both in the Martinsville and Duke hospitals, to eliminate the possibility of contracting a venereal disease. At the time of trial Mrs. Floyd was still under the doctor's care and improving. The doctor said that he hoped Mrs. Floyd would regain her normal health in six to nine months.

Each defendant, soon after his arrest, signed a written confession to the effect that he was a participant in the crimes, and was present and saw the other six ravish Mrs. Floyd. Two, Booker T. Millner and Francis DeSales Grayson, said they got on her with their trousers open, but could arouse no passion and were unable to have intercourse with her.

Four defendants, Joe Henry Hampton, Frank Hairston, Jr., Booker T. Millner, and James Luther Hairston, testified in their own behalf. Joe Henry Hampton was the only one of the four who made the slightest denial of the truth of his confession. He did not deny or affirm the charge that he had ravished Mrs. Floyd. He claimed that he was drunk at the time and did not remember. However, on cross-examination, he remembered all other details set forth in his confession, except having ravished Mrs. Floyd. His guilt was proven by three other witnesses, two of them disinterested.

Seven of the assignments of error, set forth in each of the six petitions for writs of error, are couched in the same language, and are:

The Court erred—

(1) "In refusing to grant the original consolidated motion for a change of venue."

(2) "In failing to order a change of venue or a change of venire * * * on its own motion."

(3) "In propounding the following question to the prospective jurors: 'Do either of you gentlemen have any conscientious scruples against the infliction of a death penalty in a proper case?' without inquiring as to whether the prospective jurors had any conscientious scruples against inflicting the minimum penalty."

(4) "In failing to strike the confessions from the evidence after it appeared that they were obtained without due process of law."

(5) "In entertaining and deciding the admissibility of the evidence * * * while in chambers and in the absence of the defendants."

(6) "In permitting police officers, who were material witnesses for the prosecution, to remain in the courtroom during the trial * * * after all other witnesses had been excluded."

(7) "In sentencing petitioners, on account of their race and color, to death, pursuant to the policy, practice and custom of the Commonwealth of Virginia, to inflict the death penalty upon Negroes, because of their race and color, convicted of rape upon white women, while failing and refusing to inflict the death penalty upon white or any other persons convicted of rape of Negro women."

The arguments and authorities cited in support of the foregoing assignments of error are the same in each brief.

These assignments will be discussed in the order stated.

Assignments of error numbered (1) Refusal of the trial court to sustain a joint motion for a change of venue, and (2) failure of the trial court to order a change of venue or a change of venire on its own motion, will be considered together.

Nine affidavits and ten exhibits, consisting of news articles published in the MARTINSVILLE BULLETIN, were filed in support of defendants' written motion for change of venue. It is contended that the publication of these articles and the general discussion of the crimes had aroused such "great public indignation, feeling and anger" against defendants that they could not obtain a fair and impartial trial in the City of Martinsville.

The Commonwealth filed 114 affidavits, in which each affiant stated that he had heard the case discussed at various times, but that "no mass feeling had been aroused against defendants," and that in his opinion, based on what

he observed and the discussions he had had with citizens of both races, defendants could obtain a fair and impartial trial without a change of venue.

The trial court, in addition, heard the testimony of twenty-five witnesses, including both white and negro citizens. The members of both races commended the calm, restrained and non-inflammatory published accounts of the arrest of defendants and their preliminary hearings. No unusual crowd had gathered when the account of the crimes was first published and there were no threats of violence.

H. P. Williams, a negro doctor, testified that he had been living in Martinsville for twenty years; that he thought the newspaper "had handled it very well. I personally feel the reason the flames of animosity have not been stirred is because of the way the paper handled it." He said the nature of the crime was shocking but he believed that defendants could get a fair trial in Martinsville.

D. O. Baldwin, another negro doctor, testified to the same effect.

Chevis F. Horne, a Baptist minister, stated some indignation had been displayed at first, but it had subsided. Now (April 19) "the people are very calm, very deliberate and rational in their thinking about it." When asked about the newspaper articles, he said that they were written with restraint. "I don't think they have sought to make them unduly sensational. I think they have been as impartial as news articles usually are."

A motion for change of venue is addressed to the sound discretion of the trial court. That court is in a better position to pass on the question than an appellate court. Its ruling will not be reversed unless the record shows abuse of discretion. *Thompson* v. *Commonwealth*, 131 Va. 847, 109 S. E. 447; *Wood* v. *Commonwealth*, 146 Va. 296, 135 S. E. 895; *Evans* v. *Commonwealth*, 161 Va. 992, 170 S. E. 756; *Maxwell* v. *Commonwealth*, 169 Va. 886, 193 S. E. 507; *Slayton* v. *Commonwealth*, 185 Va. 371, 38 S. E. (2d) 485; *Smith* v. *Commonwealth*, 185 Va. 800, 40 S. E. (2d) 273.

The foregoing is in accord with the general rule stated in 56 Am. Jur., Venue, sec. 68, p. 68, thus:

"Under the rule in most jurisdictions an application for a change of venue in a criminal case on the ground of local prejudice rendering impossible an impartial trial is a matter addressed to the sound discretion of the court, and it is the consensus of opinion that the law presumes that a defendant can get a fair and impartial trial in the county in which the offense was committed; in order to overcome this presumption the burden is upon the defendant to show clearly that he cannot have such a fair and impartial trial. Before a court is justified in sustaining an application therefor on account of the prejudice of the inhabitants of the county it must affirmatively appear that there is such a feeling of prejudice prevailing in the community as will be reasonably certain to prevent a fair and impartial trial."

It is contended that the "notoriety" given the commission of the crime and the defendants' connection therewith by the newspapers had so inflamed the "populace of the community" that the trial judge should, of his own motion, have ordered a change of venue, or a change of venire.

The ten articles published at different times from January 9th to April 11th, 1949, contain fairly accurate accounts of the crimes, the arrest of defendants, the appointment of attorneys to defend them, the preliminary hearings some of the evidence introduced, confessions of defendants, and the action of the grand jury. These accounts were published in as mild and temperate language as could be expected from the nature of the crimes. They were matters of public interest—some of which were taken from public records. There is no statute, or rule of court, in this jurisdiction, prohibiting publication of confessions, or the testimony introduced in criminal proceedings, as is the case in some other jurisdictions. See *Baltimore Radio Show* v. *State* (Md.), 67 A. (2d) 497; *Bridges* v. *California*, 314 U. S. 252, 62 S. Ct. 190, 86 L. ed. 192, 159 A. L. R. 1346.

Dealing with the question in *Evans* v. *Commonwealth*, 161

Va. 992, 170 S. E. 756, where newspaper accounts of that crime contained severe, harsh and condemnatory language, which is not characteristic of the published articles now under consideration, we said:

"A man makes his own history and cannot complain if the facts are published; bishop or pirate, all must face them, for so is justly 'judged the world and the people with the truth.' We see nothing seriously objectionable in the account of this homicide published in the 'Lebanon News.' It does state that the accused was hurried off to prevent mob violence and that he now contends was the exact truth. He did kill a man in 1921. A jury found him guilty of second degree murder. That case was reversed on appeal. *Evans* v. *Commonwealth*, 137 Va. 765, 119 S. E. 92. Indeed no statement there made is seriously denied.

"The account in the 'Honaker Herald' is less temperate. It characterizes the homicide as uncalled for murder, but it is said that 'quiet now prevails and our people are now willing for the law to take its course.' Press accounts of local homicides written *dum fervet opus* usually reflect public opinion. The accused contends that he stood upon the night of the killing in immediate danger of mob violence. In other words, he felt that the public thought he was guilty of murder, and so this publication made ten days afterwards did but restate what he now claims was generally believed.

"Of course, it is possible to go beyond fair bounds and when this is done courts should intervene, but they should do so with caution, for newspapers have the right to publish news."

The trial court, in ruling on the questions in the cases now under consideration, said:

"I'd like for the record to show that this argument before the Court and the hearing here today has been in the presence of the Court, the attorneys and the Officers of the Court. The public has been excluded. Any prospective jurors have been asked to leave the Courtroom and I don't think there

were any such in the Courtroom when this proceeding started.

"Clearly the defendants here have not brought themselves within the rule of the Virginia law regarding the change of venue. The public in this community should be congratulated upon the way they have conducted themselves in this matter. The press should be congratulated in the way it has handled the news of this unfortunate thing. There has been no mass feeling against these defendants. The charge alleged against them is a horrible charge and it is perfectly natural that people will discuss happenings of this kind. They will discuss them in any community and this community is no different from any other in that regard. They have been very temperate in the way they have discussed this matter, but this Court has before it here today the evidence that the defendants have presented from the witness stand and affidavits which the citizens have signed and then the Commonwealth comes forward with some hundred affidavits from most prominent citizens in this city who state that there can be a fair trial held here. The proof is overwhelming that there is no feeling against these people that would deny them a fair and impartial trial here. Unfortunately, this race question enters into the matter. The members of both races have conducted themselves splendidly. We may run into difficulty in securing jurors. You can't tell. That possibility occurs in any case where people have discussed the matter, the happening of the crime. Still, it is extremely difficult to secure jurors who have not expressed an opinion in the matter. But we will have to cross that bridge when we get to it. I feel confident that if and when a jury is selected to try these defendants, whether they are tried singularly or in a group, that they will give them a fair and impartial trial. The Court will permit strenuous examination of any panel that is brought here for trial and will see that any juror that goes in the box will be free from prejudice and under their oaths will give these

people all the law requires which is a fair and impartial trial according to the law and the evidence."

(3) Defendants state their third assignment of error in the following language:

"The Court erred in propounding the following question to the prospective jurors: 'Do either of you gentlemen have any conscientious scruples against the infliction of a death penalty in a proper case?' without inquiring as to whether the prospective jurors had any conscientious scruples against inflicting the minimum penalty, particularly where certain jurors were excluded from service by reason of the fact that they had such conscientious scruples, and thereby depriving him of his life and liberty without due process of law, in violation of Section 1 of the Fourteenth Amendment of the Constitution of the United States, and of the Constitution and laws of the Commonwealth of Virginia."

The Commonwealth, in all criminal cases, as well as an accused, is entitled to submit its case to a fair and impartial jury, free from legal disqualifications.

Sec. 19-185 of the 1950 Code provides:

"A person whose opinions are such as to prevent his convicting any one of an offense punishable with death shall not be allowed to serve as a juror on the trial for such offense."

This statute has been in effect since 1847 (Acts 1847-48, p. 149, sec. 15), and was considered by the general court in *Clore's Case* (1851), 8 Gratt. (49 Va.) 606. This case declared that it was the duty of the trial court to reject a juror who held conscientious scruples against inflicting the death penalty. In *Montague* v. *Commonwealth*, 10 Gratt. (51·Va.) 767, it was said to be the duty of the court, of its own motion, to examine prospective jurors on their *voir dire* to ascertain, among other things, whether they had conscientious scruples against inflicting capital punishment. See *Cluverius* v. *Commonwealth*, 81 Va. 787, 794, 795.

Under the foregoing statute and the decisions of this court, trial judges, for more than one hundred years, have propounded similar questions to prospective jurors in every

criminal case where death was the maximum punishment prescribed for the crime under investigation, and the prosecution had indicated its intention to ask for the extreme penalty.

Defendants' contention on this point is in the teeth of the statute, a long line of decisions and the established practice in this jurisdiction. Defendants' argument perhaps would be appropriate if made to the legislature, but it is not appropriate in a judicial forum.

(4) Defendants assign error to the action of the court in permitting the confession of each defendant to be read in evidence against him.

No objection was made to the admission of the confessions. No motion was made to reject them in the respective trials, although each defendant was represented by an able and experienced attorney.

Appellate procedure in this jurisdiction precludes this Court from considering questions not raised in the lower court. However, in *Ashcraft* v. *Tennessee*, 322 U. S. 143, 147, 64 S. Ct. 921, 88 L. ed. 1192, and *Haley* v. *Ohio*, 332 U. S. 596, 68 S. Ct. 302, 92 L. ed. 224, it was held that the verdict of a jury affirmed by a State court declaring a confession to be voluntarily made did not foreclose an independent examination of the question by the Supreme Court of the United States. "If the undisputed evidence suggests that force or coercion was used to exact the confession, we will not permit the judgment of conviction to stand, even though without the confession there might have been sufficient evidence for submission to the jury." 332 U. S. 599.

There is no evidence in this case which tends to show that force or coercion was used to obtain any of the confessions.

The *corpus delicti* in most cases is easy to establish. Proof of the criminal agent is not always easy to obtain. It is the duty of police officers, when informed that a crime has been committed, to obtain all available information, and to examine all persons who they have reason to believe are in position to assist them in ascertaining the criminal agent.

Such examinations include prisoners suspected or charged with the commission of the crime. However, this duty does not permit the officers to mistreat or violate the constitutional rights of any person they may have in custody. Cruel, unjust or coercive methods are not permissible, and are not tolerated by this Court, or any other court with proper respect for due process.

Sergeant James E. Barnes testified that on the night of the crime and soon after defendants were arrested, he interviewed them separately. He told each defendant that he desired to ask him some questions and wanted him to tell what he knew about the crimes. Each defendant was informed that he was not compelled to answer the questions, and he might refuse to do so if he so desired, but that if he made any statements, such statements might be used for or against him. No threats were made against any defendant. No promises or inducements were made or used to persuade defendants to sign the statements.

Each confession was written in longhand, read to, or by the defendant and signed by him. A few days later each confession was typewritten and taken to defendants who were held in different jails outside of Martinsville. The typewritten statement was either read to or by the defendant who had made it, and he was asked if it was correct. Again the officers told each defendant that he did not have to sign the confession, but if he signed it, it might be used for or against him. Each defendant, without objection or hesitation, signed the typewritten confession.

There being no denial of this testimony, the confession of each defendant was admitted in evidence, without objection, in the trial of the respective cases.

Three defendants, Howard Hairston, Francis DeSales Grayson, and John Clabon Taylor, did not testify in their own behalf. There is not a scintilla of evidence to the effect that any one of the three confessions was untrue or illegally obtained.

James Luther Hairston was not questioned on direct or

cross-examination about his statement to the officers. He admitted having intercourse with Mrs. Floyd and his only defense to the charge was that she did not resist.

The grounds upon which defendants rely in this Court for the alleged error in admitting the confessions, are that they were uneducated—six were between the ages of eighteen and twenty-one years—all were in custody and had not engaged counsel. These facts, considered together, are insufficient to bring the cases within the rule announced in the majority opinions in *Haley* v. *Ohio, supra,* and *Malinski* v. *New York,* 324 U. S. 401, 65 S. Ct. 781, 89 L. ed. 1029.

(5) The fifth assignment of error is based on the allegation that the trial court ruled on the qualification of jurors and the admissibility of evidence in the absence of the accused.

Although this assignment of error is set forth in five petitions, each petition cites the record of the trial of John Clabon Taylor and James Luther Hairston to support it.

The stenographic report of the evidence does not, in express terms, state that the two defendants were present at any stage of their trial, but this is true of the stenographic report in each of the cases. However, it is stated in the orders of the court that defendants were present when the case was called, when jurors were examined, and when motions were made, whether they were made in chambers or in the court room. It is also stated in the orders that when the trial judge retired to chambers to consider motions, the attorneys for the Commonwealth, the attorneys for defendants, *and defendants* themselves, retired to chambers also.

The stenographic report purports to contain the proceedings had on April 21 and May 2, 1949. It contains the name of the judge presiding, the appearance of the attorneys for the respective parties, and the name of the court reporter, but does not note the presence of defendants. Then follows the reading of the indictment by the clerk, the pleas of not guilty made by the two defendants in person, and a motion made by their attorney for severance. The

report does not contain a statement to the effect that "defendants were present," but they could not have made the plea in person if they had not been present.

The report continues as follows: "May 2, 1949

### MORNING SESSION.

"Witnesses for the Commonwealth and Defense were called and sworn. All witnesses with the exception of the officers were excluded from the Courtroom.

"All other persons with the exception of the officers of the Court, the attorneys and parents of the defendants were excluded from the Courtroom.

"In Chambers before the attorneys for the Commonwealth and the attorneys for the defendants:"

Immediately following this is an account of the discussion which took place between the attorneys for the respective parties and the judge. The entire proceedings of the trial, from the examination of the jurors on their *voir dire*, to a return of the verdicts, would appear from the stenographic report to have taken place in chambers and not in the court room.

The only reasonable inference that can be drawn from a careful examination of the stenographic reports and the orders of the court is that defendants were present in person at every stage of the trial.

We said in *Gilligan's Case*, 99 Va. 816, 37 S. E. 962: "While no intendment can supply an omission from the record of that which is material, all proper inferences may, and must be, drawn from that which does appear, and while the presumption that all things have been properly done in a court of record cannot be resorted to in a criminal case, it is equally true that there can be no presumption of error."

The discussion by the court and counsel on the admissibility of certain evidence against defendants, John Clabon Taylor and James Luther Hairston, was simply a

preparation for a ruling by the court when the question arose on the actual trial. The record shows that the attorney for the two defendants, in chambers, stated to the court that he did not think evidence as to what happened to Mrs. Floyd on the railroad track before these defendants arrived on the scene was admissible against them. The court simply indicated that it agreed with the views expressed by the attorney and would exclude all evidence, except that tending to show the condition of Mrs. Floyd when the defendants arrived on the scene. Subsequently, in the course of the trial, these questions were raised and the court passed upon them in the presence of defendants.

This part of the assignment of error is squarely within the influence of the decision in *Williams* v. *Commonwealth*, 188 Va. 583, 50 S. E. (2d) 407, where this is said:

"The prisoner's right of personal presence in a felony case throughout the trial from arraignment to sentence, when anything is done that can affect his interest, is an inalienable one. It is to be rigidly and jealously guarded. Yet, in its protection and enforcement, it must not be so enlarged as to exceed its true scope and thereby made to include all inquiry into and consideration of purely legal matters by the trial judge which are in fact and reality merely careful and prudent preparation for the resumption and conduct of the trial."

(6) Defendants' sixth assignment is that the trial court committed prejudicial error when it permitted two police officers, Sergeant Barnes and A. T. Finney, to remain in court during the trial.

This contention does not merit serious consideration. The record discloses that after all the witnesses were sworn, they, as well as all other persons, except the police officers and relatives of defendants, were excluded from the court room.

A majority of the states have adopted the English custom which is, that exclusion, separation and sequestration of wit-

nesses is a matter not of right, but within the sound judicial discretion of the trial court. 53 Am. Jur. sec. 31.

This is the statute law in this Commonwealth. Section 19-219 of the 1950 Code of Virginia, provides: "In the trial of all criminal cases, whether the same be felony or misdemeanor cases, the court may, in its discretion, exclude from the trial any or all persons whose presence is not deemed necessary."

In *Burford* v. *Commonwealth*, 179 Va. 752, 20 S. E. (2d) 509, we said: "As both the common law and the statute give the trial court discretion in the matter, this court will not reverse its ruling unless the record discloses an abuse of that discretion. A careful examination of the record in this case does not disclose that the exemption of the prosecuting witness from the operation of the rule was prejudicial to the accused. For a discussion of this question, see 23 C. J. S., Criminal Law, sec. 1010, *et seq.*" *Huffman* v. *Commonwealth*, 185 Va. 524, 39 S. E. (2d) 291.

The records do not disclose that the presence of the two officers in the court room during the trials was prejudicial to defendants. If defendants objected to their presence, the objection should have been brought to the attention of the trial court at the time. This was not done. To raise the question in this Court for the first time violates elementary rules of appellate procedure.

(7) The seventh assignment of error is that it is "the policy, practice and custom of the Commonwealth of Virginia, to inflict the death penalty upon negroes, because of their race and color, convicted of rape upon white women, while failing and refusing to inflict the death penalty upon white or any other persons convicted of rape of negro women."

There is not a scintilla of evidence in the records to support this statement and it is contrary to fact.

In *Legions* v. *Commonwealth*, 181 Va. 89, 23 S. E. (2d) 764, Legions, a young negro man, was charged with raping a white woman, convicted and given the extreme penalty.

On review by this court, the verdict of the jury was set aside and the judgment reversed on the ground that the evidence was insufficient to support the verdict. To the same effect see *Terry* v. *Commonwealth*, 174 Va. 507, 6 S. E. (2d) 673.

This contention is an abortive attempt to inject into the proceedings racial prejudice, which the trial court was extremely careful to avoid. On the day the cases were called, and before the jurors were examined on their *voir dire*, the able and experienced trial judge made the following statement to the attorneys for the Commonwealth and the attorneys for defendants:

"Gentlemen of counsel, as you know, we are here called upon to try seven men charged with the most serious crime. It has been indicated by both attorneys for the Commonwealth and attorneys for the accused that these men will enter pleas of not guilty and will be tried separately. It has also been stated by the Commonwealth Attorney that he will ask for the extreme penalty in each case. The seriousness of the charge against these defendants throws upon the Court and upon the attorneys representing both the Commonwealth and the accused a great responsibility. I have known each of you for a long time and I know that I can count upon both sides to do their duty fairly and well. This entire matter is unfortunate. If possible, it is made more regrettable due to the fact that these seven negroes are charged with the rape of a white woman. We here in the City and County have been entirely free from any trouble between the races. We have in our community a negro population of splendid citizens and these good negro citizens deplore this unfortunate alleged happening as much, or more, than do the citizens of the white race. I here and now admonish you that this case must and will be tried in such a way as not to disturb the kindly feeling now locally existing between the races. It must be tried as though both parties were members of the same race. I will not have it otherwise.

"Very soon after these men were arrested and charged with this crime, and before a preliminary hearing had been held, I appointed for each of the defendants an able attorney to represent him and I now request that you older and more experienced members of the bar appointed by the Court to defend these defendants continue to collaborate with the younger attorneys in the trial of their clients as you have collaborated with them in the preparation for trial.

"From a reading of the indictment in this case it appears that this alleged rape happened at one time and place and for this reason the defense in each case would, of necessity, be similar.

"I understand that it is the desire of counsel for the defendants to petition the Court today for a change of venue. In a very few minutes I will hear you on this motion. And I want to assure you that the officers of this Court stand here ready and willing to give to the defense attorneys any necessary assistance in bringing the Court any witnesses you may desire to examine on this subject. It is my wish, and I here express it to you, that you play fairly with the Court. If you gentlemen for the defense honestly think and believe that a change of venue is desirable after both sides have concluded the evidence on this point, you will of course insist upon your motion. Otherwise not. And conversely, if the Attorneys for the Commonwealth honestly think and feel that no change is necessary, they should of course oppose the change, but if there is any doubt on this question in the minds of the attorneys representing the Commonwealth, I want you to fairly state this to the Court.

"It is our duty as lawyers to see that these defendants receive a fair and impartial trial according to the law and evidence, and that a true verdict be rendered in each case. To this end, I ask the help of all of you."

██ In this Commonwealth it is the duty of the jury (unless the jury is waived) not only to determine the guilt or innocence of any and all persons charged with a criminal

offense, but to determine the punishment within the limits fixed by statute. 1950 Code, sections 19-267, 19-221.

 Code, sec. 18-54, provides that if a person carnally know a female sixteen years of age, or more against her will, and by force, "he shall, in the discretion of * * * the jury, be punished with death, or confinement in the penitentiary for life, or for any term not less than five years." The degrees of punishment determined by different juries vary. This variation does not depend upon the race of the accused, but upon the circumstances, aggravation and enormity of the crime proven in each case. The law applies to all alike, regardless of race or creed.

There are no ameliorating circumstances shown in the records in these cases. On the contrary, the evidence shows that four men deliberately planned to waylay Mrs. Floyd and to ravish her on her return from the Pettie home. Francis DeSales Grayson, a man 37 years of age, saw the four men attacking Mrs. Floyd. Instead of helping her, he left the scene, informed two others of what was taking place, the three went to the scene, and each, in turn, ravished Mrs. Floyd. One can hardly conceive of a more atrocious, a more beastly crime. Each defendant's participation in the criminal acts charged was established beyond the shadow of a doubt.

(8) All of defendants, except Joe Henry Hampton, contend that the court erred in permitting them to be tried "on practically consecutive days."

As John Clabon Taylor and James Luther Hairston were the last to be tried, we shall confine our discussion to the record in their case. The conclusion reached will apply to the same assignment in the other cases.

The first of these trials began on the 21st day of April, 1949. The records show that certain prospective jurors, on their *voir dire*, indicated that they had read the newspaper accounts of the five previous trials and that they agreed with the verdicts. They stated that they had not formed or expressed an opinion as to the guilt or innocence of

these defendants, and they could give them a fair and impartial trial, according to the evidence. The trial court overruled defendants' motion to reject these jurors.

Whether the prospective jurors agreed with the verdicts against other defendants was not decisive. The question was, whether or not they could give these defendants a fair and impartial trial upon the evidence to be introduced in their case. These defendants' defense was somewhat different. They claimed they used no force and that Mrs. Floyd did not resist. Some of the witnesses who were summoned and testified did not testify in the other cases.

In *Parsons* v. *Commonwealth*, 2 Rob. 771 (41 Va. 798), defendants McCune, Cottrell and Parsons were jointly indicted for murder, and upon separate trials, were found guilty of murder in the second degree. M'Cune was tried first and Parsons last. Upon examination of the jurors on their *voir dire*, one juror stated that he had heard a part of the evidence against M'Cune and a part of the arguments of counsel; that from what he had heard he had formed a decided opinion as to the guilt of M'Cune, but as to Parsons, he had no prejudice or prepossession, and he thought he would be able to give him as fair and impartial a trial as if he had heard nothing about the transaction; that the opinion he had formed as to M'Cune would have no influence upon his mind in trying the prisoner. The court held "that although the evidence as to the manner in which Nichols was killed might be the same on the trial of each of the persons indicted, yet as the proofs and circumstances indicating the presence and cooperation of each, as well as the evidence of previous threats and circumstances indicating ill blood and revenge towards Nichols, must be and were strictly confined to the separate prisoners as they respectively came upon trial, an opinion formed as to the guilt or innocence of any one of them did not implicate another whose guilt or innocence depended upon his presence and giving aid, assistance, or cooperation in the murder." This Court

sustained the action of the trial court in holding that the juror was qualified.

In *Williams* v. *Commonwealth*, 85 Va. 607, 8 S. E. 470, the defendant was jointly indicted with one John Curran for the murder of a policeman, but was tried separately. Defendant objected to the qualification of F. J. Davidson as a juror. This court, in ruling upon the objection, said:

"\* \* \* Upon his examination upon his *voir dire* Davidson had said that he had read the evidence at the trial of Curran, and had formed an opinion, but not a positive one, and 'that it would not influence his judgment on the trial; that he had no prejudice against the prisoner, and that he could give him a fair and impartial trial,—in effect, that he would try the case upon the evidence adduced upon the trial, and not upon what he had read about Curran. He was a competent juryman. \* \* \*"

We stated in *Cox* v. *Commonwealth*, 157 Va. 900, 162 S. E. 178, 182, that "The trend of recent decisions is in the direction of limiting rather than extending the disqualification of jurors by reason of mere opinion, hence the courts inquire into the character of that opinion. If it is a decided or substantial opinion as to the guilt or innocence of the accused, no matter upon what ground it was formed, the juror is incompetent, but if the opinion is merely hypothetical, and the court is satisfied from an examination of the juror on his *voir dire*, or otherwise, that he is not biased or prejudiced, and that he can give the prisoner a fair and impartial trial according to the law and the evidence, he should be accepted. No fixed and invariable rule can be laid down whereby to test the competency of the jurors, but each case should be determined by its own facts and circumstances, and great weight should be attached by an appellate court to the opinion of the trial judge." *McCue* v. *Commonwealth*, 103 Va. 870, 49 S. E. 623.

What we said in *Abdell* v. *Commonwealth*, 173 Va. 458, 2 S. E. (2d) 293, is pertinent to the issue here presented:

"It is assigned as error that the trial court erred in re-

fusing to exclude from jury service venireman R. L. Gornto after he had been examined upon his *voir dire* and accepted as a juror by the court. When examined upon his *voir dire*, Gornto stated that he had formed a 'hypothetical' opinion of the guilt of accused from what he had read in the newspapers; that it was not a fixed opinion; that he was not sensible of any bias for or prejudice against the accused; that he could give accused a fair and impartial trial according to the law and the evidence; that he did not know either accused or his wife.

"It is true that Gornto, when examined by counsel for accused, stated that the opinion he had formed was not favorable to accused. However, when asked this question by the court: 'Mr. Gornto, can you go into this jury box with an open mind and wait until all the evidence is introduced before reaching a conclusion in this case?' His reply was, 'I think so; yes, sir.' "

In *Ballard* v. *Commonwealth*, 156 Va. 980, 159 S. E. 222, 229, Mr. Justice Holt said:

"If intelligent jurors are to be secured, then there must be some relaxation of rules as to their competency. Most intelligent men and all educated men read newspapers, and they would have to be more than human if they did not form some opinion from accounts which they give of homicides like this, locally of intense interest to everybody. To reject them for this reason is to put a premium upon ignorance. What these men in substance say is that they have opinions upon what they have read, but that they can go into the jury box and give fair judgment on the case as it is unfolded during the progress of the trial. More than this could not be expected from honest men of good intelligence.

\* \* \* \* \* \* \*

"Where, as here, jurors are examined in detail both by counsel and by the judge, the rule that a judge's judgment should be given weight applies with particular force. He,

better than anyone else, can gauge their candor and their purpose to give fair judgment on the evidence."

Chief Judge Parker, of the United States Court of Appeals (Fourth Judicial- Circuit), in *Belvin* v. *United States*, 12 F. (2d) 548, 549, said:

"The competency of the individual jurors was a question addressed to the sound discretion of the trial court, and, in the absence of abuse of discretion, the action of the trial judge with regard thereto is not reviewable."

To the same effect see Mr. Justice Gregory's opinion in *Slade* v. *Commonwealth*, 155 Va. 1099, 156 S. E. 388.

A juror, on his *voir dire*, in *Winn* v. *Commonwealth*, 160 Va. 918, 168 S. E. 351, said that he had a prior fixed opinion that the defendant was guilty. We held he was not a qualified juror.

The jurors in this case stated positively that they had no prejudice for or against defendants, and that they would go into the jury box and give them a fair and impartial trial according to the evidence as it unfolded during the progress of the trial. After counsel for the respective parties had completed their examination of the jurors on their *voir dire*, the trial judge asked them:

"* * * Gentlemen, the question has been asked you by the attorneys for the defendants whether or not you agreed with the verdicts of the juries in the five cases that have been heretofore tried. I ask you this question: Are all you gentlemen satisfied in your own mind that you can go into the jury box, if you are selected to try this case, and give these two defendants now on trial a fair and impartial trial according to the law and evidence in this case as it develops here today?

"The jurors all indicate yes.

"JUDGE WHITTLE: Is there anyone who would answer that in the negative?

"The jurors all indicate no."

These two defendants admitted that they had inter-

course with Mrs. Floyd, but claimed that she did not resist, and that they used no force.

Mrs. Floyd stated that when these two defendants arrived on the scene, her underclothes had been stripped off and she was nude from her breast down. These defendants, or others in their presence, told her if she "hollered or screamed they would kill me." They were tussling among themselves and she was doing all she could to get away. She had been fighting with the other defendants for so long that she was "almost exhausted." When the last one, who appeared to be Grayson, left her, she was almost paralyzed. "I couldn't hardly get up."

John Clabon Taylor did not take the stand in his own behalf, but his statement to the officers a few hours after the crime was committed, is slightly different from Hairston's, and is as follows:

"Yesterday afternoon I was at the home of DeSales Grayson when he came home and told me that some boys had a woman up on the ridge and wanted me and James Hairston to go back up there with him. I went with them and when we got there we found Joe Henry Hampton, Frank Hairston, Jr., Booker T. Millner and Howard Hairston with a white woman. Joe Henry Hampton was on the woman when we got there. I told the other boys that that was a Christian woman and it would cause us some trouble. That we had better get away from there. That if she was a drunk we might get by with it but I could tell from the way she talked that she was a good woman. Then the boys told me that I had might as well get it, as I was there and if we got caught I would be in it as well as the rest of them, so I went to her too. I was the last one to get it from her."

Considering the nature of the defense and the examination of the jurors on their *voir dire*, we find no reversible error in the action of the court in overruling defendants' motion.

(9) Frank Hairston, Jr. is the only one of the seven defendants who assigned as error the refusal of the court

to set aside the verdict on the ground that it was contrary to the law and evidence.

In addition to Mrs. Floyd's testimony, Charlie Martin said that he saw Joe Henry Hampton and Frank Hairston, Jr. ravish Mrs. Floyd before he left the scene. The defendant, as a witness admitted that he had ravished Mrs. Floyd after she had been moved from the railroad track. He denied that he ravished her on the track. When asked by his own counsel whether he desired to make any further statement, he said:

"A. I tell you gentlemen that I know I was wrong to have gone with the woman. Maybe if I hadn't been drinking I wouldn't have did what I did do. I know I had no reason to have intercourse with the woman."

We find no reversible error in the records and the judgments are

*Affirmed.*